MINNESOTA PUBLIC INTEREST RE-
SEARCH GROUP and Sierra
Club, Plaintiffs,

v.

Earl V. BUTZ, Individually and as Secre-
tary of Agriculture, et al.,
Defendants.

No. 4–72 Civil 598.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 13, 1975.

See also, 8 Cir., 498 F.2d 1314, 508 F.2d 92.

Robert C. Lyman, Minneapolis, Minn., for Minnesota Public Interest Research Group.

Dayton & Herman by Charles K. Dayton, Minneapolis, Minn., for Sierra Club.

Robert G. Renner, U. S. Atty., by Francis X. Hermann, Asst. U. S. Atty., Minneapolis, Minn., for federal defendants.

O'Connor & Hannon by Joe A. Walters, Minneapolis, Minn., for Consolidated Papers, Inc.

Dorsey, Marquart, Windhorst, West & Halladay by Curtis L. Roy, Minneapolis, Minn., for Boise Cascade Corp., Northern Forest Products, Ltd. and The Northwest Paper Co.

Ronald W. Walls, Ely, Minn., for Kainz Logging Co.

TABLE OF CONTENTS

I. INTRODUCTION ...............................1282
 A. The Claims .......................................1282
 B. The Parties ......................................1282
 C. Litigation History ...............................1283
 D. The BWCA .......................................1285
 E. The Seven Active Timber Sales ...................1286
 1. Shell Lake Sale ..............................1286
 2. Sunnydale Sale ..............................1286
 3. Jerry Creek Sale ............................1286
 4. West Tofte Sale .............................1287
 5. East Tofte Sale .............................1287
 6. Beartrap Sale ...............................1287
 7. Old Road Sale ..............................1287
II. PREPARATION OF THE BWCA EIS AND MANAGEMENT PLAN ....................................1287
III. THE EIS AND MANAGEMENT PLAN ................1292
 A. In General .......................................1292
 B. The EIS .........................................1292
 C. The Management Plan ...........................1293

IV. VEGETATION MANAGEMENT TOOLS .............. 1294
 A. Logging ........................................ 1294
 B. Burning ........................................ 1294
 C. Administrative Cutting .......................... 1295
 D. Herbicides ..................................... 1295
 E. Neglect ........................................ 1296

V. NEPA ............................................. 1296
 A. The Act ........................................ 1296
 B. Standards for Review of EIS ..................... 1298
 C. Important Planning Considerations ................ 1298

VI. THE INADEQUACIES OF THE EIS .................. 1299
 A. Failure to Describe the Proposed Action and to Evalu-
 ate Its Impacts ............................... 1299
 1. Failure to Describe Ultimate Goal of Vegetation
 Management Policy .......................... 1299
 2. Failure of EIS to Evaluate the Vegetation Manage-
 ment Policy Adopted in Management Plan ....... 1303
 3. Failure to Develop an Overall Plan for the Selec-
 tion of Logging Sites in the Portal Zone ......... 1304
 4. Failure to Consider How Logging Operations Could
 Be Conducted with Minimum Adverse Environ-
 mental Effects ............................... 1307
 B. The Determination of Impacts ..................... 1308
 1. Inadequacies of the Matrices Method of Deter-
 mining Impacts ............................. 1308
 2. Failure to Consider Adverse Environmental Ef-
 fects Associated with Loss of Virgin Timber ..... 1311
 3. Failure to Consider the Compatibility of Logging
 with Research, Recreational, and Educational Use
 of the BWCA ............................... 1312
 4. Failure to Consider the Adverse Impacts of Po-
 tential Mineral Exploration and Extraction Opera-
 tions in the BWCA .......................... 1314
 C. Alternatives to the Proposed Action ............... 1317
 1. The Package Approach to the Alternatives ....... 1317
 a. Zoning .................................. 1317
 b. Protection .............................. 1317
 c. Management of Vegetation for Products, Pro-
 tection, Habitat, etc. ...................... 1317
 d. Recreation .............................. 1318
 e. Roads, Trails and Portages ................ 1318
 f. Minerals ................................ 1318
 2. Alternative Comparison ....................... 1320
 D. General Conclusions as to the Inadequacies of the
 EIS ......................................... 1323

VII. THE WILDERNESS ACT ........................... 1325
 A. The Special BWCA Provision ..................... 1325
 B. Statutory History of the BWCA ................... 1325
 C. The Purpose of the Special BWCA Provision ........ 1328
 D. Preserving the "Primitive Character" of the BWCA .. 1329

E. Restrictions on Timber Harvesting Which Are "Necessary" to Maintain the Primitive Character of the BWCA ........................................1331

VIII. COUNTERCLAIM FOR DECLARATORY RELIEF ......1333

IX. THE INJUNCTION ..............................1333

X. THE APPENDIXES ..............................1335
 A. BWCA Maps ........................................1335
 1. The Interior Zone ..........................1335
 2. Logging History ...........................1336
 3. Areas of Mineralization ....................1337
 B. Matrices 2 .....................................1338
 C. Alternatives ...................................1339

---

## MEMORANDUM AND ORDER

MILES W. LORD, District Judge.

## I. INTRODUCTION

### A. *The Claims*

The plaintiffs bring this action seeking an injunction and declaratory relief which would prohibit logging in the virgin forest areas of the Boundary Waters Canoe Area (BWCA), located in Northern Minnesota. They allege that the Environmental Impact Statement (EIS) prepared by the United States Forest Service and accompanying its Management Plan for the BWCA, fails to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4347, and that the Wilderness Act of 1964, 16 U.S.C. §§ 1131–1136, prohibits logging in the virgin forest areas of the BWCA. Review of the EIS is pursuant to NEPA and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

In addition, defendant Consolidated Papers, Inc. counterclaims for a declaratory judgment that the EIS and Management Plan are consistent with the Wilderness Act and that a total proscription on logging in the Portal Zone [1]

would be unlawful both under the Wilderness Act and other applicable laws and regulations.

### B. *The Parties*

Plaintiff Minnesota Public Interest Research Group (MPIRG) is a non-profit Minnesota corporation with its principal place of business at Minneapolis, Minnesota. Its members are approximately 90,000 students at some 18 colleges and universities located throughout the State of Minnesota who pay $3.00 a year to fund the corporation. The corporate purpose of MPIRG, as set out in its articles of incorporation, is "to promote the public interest and social welfare".

Plaintiff Sierra Club is a non-profit corporation organized under the laws of California with its principal place of business at San Francisco, California. It is a national conservation organization having a membership in excess of 145,000 persons.

The Government defendants are Earl V. Butz, Secretary of Agriculture; John B. McGuire, Chief of the Forest Service; Jay Cravens, Regional Forester; and James F. Torrence, Supervisor of the Superior National Forest.

---

[1]. The BWCA is divided into two zones, the "Portal" (cut) Zone and the "Interior" (no-cut) Zone. These zones are discussed in more detail, *infra* at 1285. See Appendix A–1 for map of Portal and Interior Zones.

Defendant Northern Wood Preservers, Ltd. (Northern), formerly called Northern Forest Products, Ltd., is a Canadian corporation with its principal place of business at Thunder Bay, Ontario. Northern has entered into contracts with Earle West, Jr., to take over the East Tofte Sale and with the St. Regis Paper Company to take over the West Tofte Sale. Harry Fisher, the primary owner of Northshore Forest Products, is Northern's logger on the two Tofte sales.[2]

Defendant Potlatch Corporation, (Potlatch) a Delaware corporation doing business in Minnesota with its principal offices in San Francisco, is a successor to The Northwest Paper Company which merged into Potlatch. The Northwest Division of Potlatch, which has its principal place of business at Cloquet, Minnesota, is a pulp and paper manufacturer that specializes in high grade printing and writing paper. Potlatch is now the holder of the timber sale rights previously held by Northwest.

Boise Cascade Corporation (Boise Cascade) is a Delaware corporation doing business in Minnesota, with its principal place of business in Minnesota at International Falls. Boise Cascade owns a number of pulp and paper mills in northern Minnesota and one mill in Fort Francis, Canada.

Consolidated Papers, Inc., (Consolidated) is a Wisconsin corporation doing business in Minnesota with its principal place of business at Wisconsin Rapids, Wisconsin.

Kainz Logging Company (Kainz) is a partnership with its principal place of business at Ely, Minnesota. Kainz's principal business is the production of lumber as opposed to production of pulp or paper. It has a sawmill in Ely.

Emil Abramson originally purchased the Shell Lake Sale but thereafter has assigned his interest in that sale to defendant Boise Cascade and, as a result, has not been an active party in this matter.

C. *Litigation History*

This case initially came before this Court in November, 1972 in an action filed by MPIRG. The history of this case up to April, 1973 is set forth in *Minnesota Public Interest Research Group v. Butz*, 358 F.Supp. 584 (D. Minn.1973) [1973 opinion]; *aff'd*, 498 F.2d 1314 (8th Cir. 1974); and is discussed in part *infra* at 1287–1292 as part of the EIS preparation process. The 1973 trial lasted 18 trial days with testimony contained in 2,391 pages of transcript.

On April 16, 1973 this Court issued a lengthy opinion holding that the Forest Service's actions with regard to the timber sales in the BWCA[3] constituted "major federal actions" having a significant effect on the human environment within the meaning of the National Environmental Policy Act and therefore requiring the preparation of an EIS with respect to the management policy dictating such administrative actions. 358 F. Supp. at 622–624.

On June 10, 1974 the Court of Appeals for the Eighth Circuit sitting *en banc*, with three judges dissenting, announced its affirmation of this Court's decision that NEPA required the preparation of an EIS. *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1325 (8th Cir. 1974) [Court of Appeals Opinion]. That opinion states that the issue of whether or not the Wilderness Act authorizes timber cutting in the BWCA was a "crucial question" for the District Court's determination in further proceedings. 498 F.2d at 1325 n. 31. Furthermore, the Court of Appeals assumed that the injunction would terminate upon the filing of the final EIS and that any challenge to the adequacy of the EIS would require the in-

---

2. The individual timber sales are discussed, *infra* at 1286–1287.

3. *Id.*

stitution of a separate proceeding. 498 F.2d at 1325 n. 32.

Notice of the filing and availability of the final BWCA EIS and Management Plan were published in the *Federal Register* on July 11 and 19, 1974. 39 Fed. Reg. 25524, 39 Fed.Reg. 26477.

On August 19, 1974, plaintiff MPIRG filed a motion to serve and file a Third Amended Complaint which challenged the adequacy of the EIS and sought a declaration that the Wilderness Act prohibited timber harvesting in the Portal Zone of the BWCA. On August 28, 1974, the Sierra Club moved to intervene as a plaintiff and served the proposed complaint which alleged that the EIS was inadequate and that the Wilderness Act prohibited logging in the virgin forest areas of the BWCA. These motions were granted.

The private defendants' Answers generally denied the allegations contained in MPIRG's Second and Third Amended Complaints and in the Sierra Club's Complaint and alleged that the Wilderness Act and regulations promulgated by the Secretary of Agriculture thereunder (36 C.F.R. § 293.16) permit and require that timber harvesting continue in the Portal Zone of the BWCA. In addition, defendant Consolidated counterclaimed for a declaratory judgment that the provisions of the Wilderness Act and duly promulgated regulations of the Secretary of Agriculture pertaining thereto are consistent with the final EIS and Management Plan in that a total proscription of logging of the Portal Zone would be "an illegal restriction on timber use under controlling law and regulations", particularly the Wilderness Act.

On September 12, 1974, this Court requested that the parties advise this Court by affidavit of significant changes which may have occurred regarding the status of active timber sales in the BWCA. Following the filing of such affidavits by the parties, this Court, on September 18, 1974, issued an Order and Preliminary Injunction on the grounds that the plaintiffs had estab-

lished a substantial probability of success on the merits, and that they would suffer irreparable harm if logging and logging related activities were allowed to continue pending a trial on the merits and final determination of the matter. The order enjoined the defendants from cutting timber or conducting any logging related activities including road building, in those areas of the seven active timber sales which are contiguous with the virgin forest areas of the BWCA.

A second trial on the merits commenced on November 4, 1974, and continued over 18 trial days and finally concluded on Saturday, January 4, 1975. The testimony of 12 witnesses was presented and the trial transcript is 2,228 pages. By stipulation, the testimony and exhibits received in evidence during the 1973 trial, together with supplementary proceedings held on February 8, 1973, and proceedings on plaintiffs' motion for a preliminary injunction heard in September 1974, including all affidavits and exhibits offered in connection therewith, were made a part of the record in the second trial. (Governments Exhibit 48).

On January 22, 1975 this Court vacated that portion of its order and preliminary injunction, issued September 18, 1974, enjoining defendant Consolidated from cutting timber and from conducting other logging related activities, including road building, on the Old Road Sale. Consolidated proved, upon the basis of all of the files, records and proceedings herein, that the Old Road Sale did not amount to an incursion into the contiguous virgin forest area of the BWCA.

Although this case bears the same civil number as in the 1973 case, it is in fact a separate proceeding. This Court recognizes that it is not bound by its earlier findings of fact and conclusions of law; however, the 1974 trial has shown them to be entirely accurate and correct. Therefore, while this Court may refer to individual parts of the

1973 opinion's findings of fact and conclusions of law for emphasis, or make additional findings of fact which overlap or duplicate earlier findings for purposes of clarity of presentation, the whole of the 1973 findings of fact and conclusions of law are hereby reaffirmed and incorporated here by reference. The earlier findings are of particular importance because of the discussion of the effects of logging on the primitive character of the BWCA. 358 F.Supp. 609–617.

D. *The BWCA*

A description of the unique characteristics and qualities of the BWCA is included in this Court's 1973 opinion and need only be briefly touched upon here. 358 F.Supp. at 594–596.

The Boundary Waters Canoe Area (BWCA) is located in Cook, Lake and St. Louis Counties in Northeastern Minnesota. It occupies 1,030,000 acres of land and water in the northern one-third of the Superior National Forest. The BWCA is 104 miles wide from east to west, and averages 16 miles from north to south. Its irregular northern border follows the waters and portages of the International Boundary, a distance of 145 miles. Water makes up approximately 18% of the area and allows for 995 to 1,200 miles of canoe routes[4]. (EIS at 1, 15).

The BWCA is comprised of three separate units of land. The easterly unit, sometimes called the Caribou Unit, is separated from the main area of the BWCA by the Gunflint Trail. To the west, the so-called Little Indian Sioux Unit is separated from the main portion of the BWCA by the Echo Trail. *Id.*

The BWCA is divided into two zones. The Interior Zone, sometimes referred to as the "no-cut" zone occupies some 618,000 acres of land and water, including 100,000 acres added to the Interior Zone in 1975. The Interior Zone contains over 90 percent of the lake surface area of the BWCA and is the area which receives the primary recreational usage. As the name implies, the Portal Zone is the entry zone through which persons pass to reach the Interior Zone. It consists of some 412,000–418,000[5] acres of land and water around the southern perimeter of the BWCA.

The Court of Appeals Opinion describes the BWCA as follows:

The BWCA, located in northern Minnesota, is a unique natural resource with some 1,060,000[6] [sic] acres of lakes, streams, and timber, which along with the adjoining Canadian Quetico-Superior forest forms the only canoe wilderness area in the world. The area contains more than 1,000 lakes larger than 10 acres, either connected by streams or convenient portages that allow for easy canoe travel through the wilderness area.

The BWCA is administered by the United States Forest Service as a Wilderness Area and as a part of the Superior National Forest. The Draft Management Plan of the Forest Service for the BWCA refers to the area as "unique, pristine, endangered, rugged, primitive, beautiful and fragile." Highly prized by many, including plaintiff MPIRG, the Wilderness Area affords recreational, scientific, and educational opportunities. It is also highly regarded by others, like the defendant paper and logging companies, who value the thousands of acres of marketable timber it contains. 498 F.2d at 1316–1317.

4. The number of miles of canoe routes varies depending on which page of the EIS the reader consults. (EIS 1, 15).

5. This figure varies depending upon whether the reader consults the Management Plan or the EIS. (EIS at 101, Management Plan at P–15).

6. 1,030,000 is the figure given in the EIS at 1.

E. *The Seven Active Timber Sales*

There are currently seven active timber sales within the Portal Zone of the BWCA. Any future sales made during the lifetime of the EIS and Management Plan would be within this zone.

The Forest Service's action with regard to these sales (and four other sales no longer relevant) constituted the major federal action significantly affecting the quality of the human environment that required the preparation of this EIS. 358 F.Supp. at 622; 498 F.2d at 1316, 1319–1323.

Evaluation of the environmental impacts of each of these timber sales is not a part of the final EIS.[7] It is the Forest Service's position that "Environmental Analysis Reports" (EARs) made in 1973 for each timber sale satisfies the requirements of NEPA. (Governments Exhibits 40–46). This issue is discussed *infra* at 1306–1307 as part of the discussion of the inadequacies of the EIS.

A brief description of each of the existing sales including its location and a map is contained as Appendix C of the EIS and Management Plan. Additionally, a description of each sale is contained in this Court's 1973 Opinion, 358 F.Supp. at 604–609, and in the EAR prepared for each sale. Therefore, each sale need only be briefly described here.

1. *Shell Lake Sale.* This sale is located on the southwestern edge of the BWCA just to the west of the Sunnydale Sale and to the south of Shell Lake. It is primarily adjacent to virgin forest areas as well as some logged areas. Logging in the enjoined areas of this sale would be a direct incursion into the main virgin forest area of the BWCA. This sale, to be logged by defendant Boise Cascade, can be logged only in the winter. Access to this sale is via a winter road from the Echo Trail. Winter

spur roads must be constructed to complete this sale.

2. *Sunnydale Sale.* This sale is located on the southwestern edge of the BWCA just to the northwest of Ramshead Lake and to the north of the Echo Trail. It is almost entirely surrounded by virgin forest and, if logged, would be a direct incursion into one of the main virgin forest areas of the BWCA. A portion of the Sunnydale Sale was burned in the Little Sioux fire, May, 1971, and, along with the perimeter around the burned area, has been eliminated from the sale area. Defendant Potlatch intends to log the Sunnydale Sale in the winter only. Approximately one-half of the nearly 10 miles of road which will be required in order to complete this sale remains to be constructed. The Sioux-Hustler Trail runs north and south through the Sunnydale Sale. The EAR for this sale requires that a reserve strip be provided on either side of the trail in which no logging would occur. This curtain is intended to shield the effects of logging from hikers who stay on the trail. However, those hikers who wander off the trail will encounter the sale.

3. *Jerry Creek Sale.* This sale is located on the southwestern edge of the BWCA just to the southeast of the Sunnydale Sale and to the southwest of White Feather Lake. It is almost entirely surrounded by virgin forest area. Logging in the enjoined areas of this sale would be a direct incursion into one of the main virgin forest areas of the BWCA. Logging is permitted only in the winter. The Jerry Creek Sale was originally awarded to Northwest Paper Company (now defendant Potlatch). Access to it is by winter road leading from the Echo Trail. Approximately 1.7 miles of road have been constructed on the sale and an additional three miles must be built to complete logging.

---

**7.** The EIS Matrices at 122 (Appendix B to this opinion) do contain a brief evaluation of continuing or discontinuing existing timber sales as a whole. This Court, however, does not consider this passing reference to the timber sales as in any way amounting to a meaningful or useful evaluation.

4. *West Tofte Sale.* This sale is located on the southeastern edge of the BWCA to the west of Alton Lake and inland from the North Shore community of Tofte. It is surrounded by virgin forest on the north, the East Tofte Sale on the east and an area logged after 1940 to the south. Logging in the enjoined areas of this sale would be a direct incursion into the main virgin forest area of the BWCA. A substantial part of this sale is included in the 1975 addition to the Interior Zone.

In addition, 8,500 acres lying east of the Lujenida-Zenith Portage, as well as a triangular shaped area lying north of the Lujenida to Fredrick Lake Portage, have been deleted from this sale under the EAR prepared for this sale. Defendant Northern is the current holder of this sale. Summer roads with spot gravelling and winter haul roads must be constructed to harvest the remainder of the sale area. The main timber haul road crosses the Phoebe River very close to the western border of the West Tofte Sale and more importantly it crosses the Knight-Hazel Portage. A winter road will be constructed across Barto Creek. Canoe routes will be within hearing distance of logging activities. Several canoe routes pass through or adjacent to the sale area and in addition the area receives some use by hikers, fishermen, campers, snowshoers and cross-country skiers. Users who seek a wilderness experience off the designated routes will see and hear logging activity. Logging will occur in an area around and north of Barto Lake and Barto Creek. Barto Lake is a warm water lake with potential for recreational use.

5. *East Tofte Sale.* This sale is located in the southeastern portion of the BWCA to the southwest of Brule Lake. It is surrounded by virgin forest to the north; Sawbill Lake to the west; an area logged after 1940 to the south; and the Black Spruce Sale to the east. Logging in enjoined areas of this sale would be a direct incursion into the main virgin forest area of the BWCA. On February 2, 1973 this Court enjoined logging north of the line (west to east) from the tip of Sawbill Lake to the northern tip of Hide Lake to the northern tip of Clam Lake to the southern tip of South Temperance Lake. Except for this area, logging on the East Tofte Sale is now complete. This sale is currently held by defendant Northern. The road system necessary to log the remainder of the sale is partly constructed; however, spur roads need to be constructed for the completion of this sale. The principal timber haul road into this sale crosses the Kelly Lake to Burnt Lake Portage near the southern boundary of the sale. The Forest Service has received complaints in the summer months from users who have heard the noise from logging machinery.

6. *Beartrap Sale.* This sale is located on the southwestern edge of the BWCA just to the northwest of the Old Road Sale and Home Lake. It is adjacent to some virgin forest areas as well as some areas logged since 1940. Cutting in the enjoined area of this sale would be a direct incursion into the contiguous virgin forest area of the BWCA. This sale is owned by defendant Kainz. Access to the area is by winter road paralleling Spring Creek from the Echo Trail Road to the sale area. Approximately two miles of road will be necessary to complete the logging in this sale area. This area receives some recreational use by cross-country skiers.

7. *Old Road Sale.* This sale is located on the southwestern edge of the BWCA to the southeast of Home Lake. It does not amount to an incursion into the main virgin forest area of the BWCA and for that reason was released from this Court's earlier injunction by order dated January 22, 1975.

## II. PREPARATION OF THE BWCA EIS AND MANAGEMENT PLAN

During a three-year period from May, 1971 to June, 1974, the Forest Service engaged in a planning process which culminated in the preparation of a new

BWCA EIS and Management Plan. The process began in May, 1971 when Regional Forester Jay H. Cravens directed the Supervisor of the Superior National Forest to prepare a land use management plan for the Superior National Forest and the BWCA. The initial decision was to prepare a management plan for the entire Superior National Forest followed by a separate plan for the BWCA. The stated purpose of the BWCA Plan was to update and revise existing BWCA management guidelines and to assure that the administrative policies were responsive to current knowledge about the environment and the needs of the public. At the same time, a determination was made that the plan would be a major federal action and the Supervisor was further directed to prepare an EIS in accordance with NEPA.

To carry out this directive a planning team was formed which initially consisted of four-full-time members including a planning leader, a professional forester, a wildlife biologist and a landscape architect. A full-time forester-economist, a soil scientist, a hydrologist and a geologist were subsequently added to the team. Job descriptions were developed for the planning team members. Other staff experts assisted the planning team on a part-time basis, as required.

In the fall of 1971 the planning team prepared *Objectives and Policy Guides for the Superior National Forest* (Governments Exhibit 52) which stated various objectives to be used as the framework for the Management Plan. The objectives included making the forest an outstanding example of coordinated land use and value protection, involving the public in the management of the forest, providing optimum benefits from the forest consistent with resource capabilities, working to improve economic and social well-being of area residents and developing an effective and achievement-oriented organization. A number of specific policies to accomplish each

objective were also stated therein. Copies of this document were forwarded to interested persons.

During this same period, on November 18, 1971, legal counsel for plaintiff MPIRG submitted, to the Forest Service and to the Department of Agriculture, a request that an EIS be prepared on 14 active timber sales under contract and on the timber management practices, in general, in the BWCA; and further requested that all timber cutting be halted until the EIS was prepared. (Defendants Exhibit 2). Assistant Secretary of Agriculture, T. K. Cowden, replied to this request in January, 1972 stating that all existing timber sale contracts within the Portal Zone of the BWCA would be continued and that the existing timber sales in the Portal Zone were made in accordance with the Wilderness Act of 1964 and the Secretary of Agriculture's regulations which authorized commercial timber harvesting in the Portal Zone of the BWCA. (Plaintiffs Exhibit 72).

During early 1972 the planning team, headed by Robert L. Rice, Assistant Forest Supervisor in charge of Planning, developed a 30 page booklet entitled *Three Million Plus* (Governments Exhibit 54) which had as its purpose the formulation of an orderly planning process for the EIS and Management Plan. This booklet set out the process for preparing the EIS and Management Plan.

In April, 1972 because commercial timber harvesting in the Portal Zone was becoming a controversial issue, a decision was made to focus planning team efforts on the BWCA alone and to stop work on the separate EIS and Management Plan for the Superior National Forest. Thereafter, a decision was made to prepare a Preliminary Environmental Analysis for existing timber management activities in the BWCA. (Governments Exhibits 32, 60).

The initial work of the planning team and other Forest Service employees who worked on the Plan included:

(a) collecting information and ascertaining the issues, concerns and problems in managing the BWCA from interviews and discussions with District Rangers, Supervisor's staff, University of Minnesota School of Forestry staff, Minnesota Department of Natural Resources staff, and staff at the North Central Experiment Station in St. Paul, (a research arm of the Forest Service);

(b) gathering information through field inventories and collecting written material for the planning process;

(c) conducting 23 informal public discussion workshops during October and November, 1972 in local communities in northern Minnesota and also in the Minneapolis-St. Paul area for the purpose of advising the public of the progress of the Management Plan and also to obtain the responses, comments and reactions of the public to the management proposals and issues for the BWCA; and

(d) requesting the comments and views of other citizens by mailing a public information package. (Responses from 77 persons were received.)

On November 24, 1972 MPIRG filed its First Complaint for injunctive relief requesting that the defendants be enjoined from logging or conducting logging-related activities in the BWCA until the Forest Service had prepared an EIS which complied with NEPA. Following a trial on the merits in January 1973, this Court enjoined the Government defendants and private defendants from logging in specific areas of the Portal Zone (primarily those areas that are contiguous to virgin areas of the forest) until the Forest Service had completed its BWCA Management Plan and accompanying EIS. 358 F.Supp. at 630.

In December 1972 the planning team assembled the first edition of *Superior Planning Notes* under one cover. (Governments Exhibit 59). This document consisted of almost two hundred pages of information regarding BWCA geology, history, climate, federal and state laws and regulations, economics, soils, minerals, vegetation, recreation, water, fish and wildlife, insects and disease, land occupancy, land adjustment, fire and fire protection, research, history, archeology, educational values, travel network and entry information. The Planning Notes were revised from time to time as new information was obtained.

During the week of January 15–19, 1973 the planning team, forest staff and district rangers met to analyze and discuss the alternatives presented by the planning team and to make preliminary decisions regarding these alternatives, which would be reflected in the Draft EIS and Management Plan. The alternatives discussed were in the form of management options for each of several management activities or uses and not in the form of the six alternative "packages" which appear in the Final EIS. (Governments Exhibit 76). Mr. Rice, the planning team leader, in his testimony at the 1974 trial characterized the alternative packages as "first order alternatives" and the alternatives for each management activity as "second order alternatives". (Transcript 161–163). Both "first order alternatives" and "second order alternatives" have been referred to as "management alternatives". The alternatives are discussed *infra* at 1317–1323.

On January 26, 1973 the planning team issued a summary of its preliminary decisions and a rough draft of BWCA management directions (Governments Exhibit 80).

On August 1, 1973 the Council on Environmental Quality (CEQ) issued new guidelines to apply to all impact statements filed with the Council after Janu-

ary 28, 1974, 40 C.F.R. § 1500, 38 Fed. Reg. 20550 (1973). These guidelines apply to the BWCA EIS.

In November, 1973 the Council on Environmental Quality informed the Washington Office of the Forest Service that the BWCA Management Plan and Environmental Impact Statement did not meet the requirements of NEPA. The most critical deficiency was the failure to present alternatives. (Governments Exhibit 116).

On December 6, 1973 a meeting was held in the Washington office of the Forest Service which was attended by Robert Lunt, a representative of the Council on Environmental Quality, various representatives of the Superior National Forest, and representatives of the Forest Service at Washington and of its regional offices. Mr. Lunt of CEQ informed the Forest Service representatives that he was considering a recommendation that the Draft Environmental Impact Statement be withdrawn and revised since it did not adequately discuss the full range of resource management alternatives or the reasons behind various changes in policy from those presently in effect in the BWCA. Specific areas of CEQ concern were: 1) vegetation management (timber harvest, fire management, insect and disease control); 2) snowmobile use; 3) horsepower limitations for motorboats; and 4) reserved rights in connection with mechanical portages.

With regard to vegetation management, CEQ was concerned with the failure of the Draft EIS to consider the full range of alternatives for timber harvesting (from no harvesting to complete cut over) and for fire management (from no use of fire to exclusive use of fire in place of timber harvesting).

The Forest Service objected to withdrawing the Draft, EIS since many public comments had been received. Instead, the Forest Service agreed to rewrite the EIS and include an in-depth discussion of alternatives in the Final EIS. (Governments Exhibit 116 at 4).

After this meeting, and based upon discussions and preliminary decisions therein and upon the various documents and other materials assembled and utilized by the planning team (including the Superior Planning Notes and the public involvement analysis), the team prepared various matrices for use in the Draft EIS. These matrices (EIS 121–127) became the Forest Service's tool for stating the environmental impacts of each and every Management Activity or Use, including vegetation management by logging. The matrices are discussed *infra* at 1308–1311. Additionally the matrix dealing with vegetation management (EIS at 122) is reprinted as Appendix B to this opinion.

In the spring of 1973 the Forest Service prepared EARs on each of the existing timber sales. These EARs were prepared initially by the district rangers, and were reviewed by a team on the staff of the Superior National Forest. Ultimately they were approved by the Forest Supervisor or his deputy. The EARs recommended modifications in existing sales, including the deletion of some areas from cutting. (Governments Exhibits 40–46; Transcript 324–327, 334–337).

The Draft Management Plan and Environmental Impact Statement were filed with the CEQ on August 15, 1973 and were released and made available to the public and interested members of Congress the next day. Notice was then filed in the *Federal Register* as required by NEPA. 38 Fed.Reg. 23820 (1973).

Instead of the usual 45-day period for public comments provided by the CEQ guidelines, the Forest Service decided that a full 60 days would be available. During the review period close to 800 copies of the Plan and EIS were distributed and 499 public responses thereto were received by the Forest Service.

On November 19, 1973 proposed Forest Service guidelines based on the Au-

gust 1, 1973 CEQ guidelines (40 C.F.R. § 1500) for the preparation of EISs were published in the *Federal Register*. 38 Fed.Reg. 31922.

Following the December, 1973 meeting with Mr. Lunt of CEQ, the Forest Service prepared a content outline of the Final EIS which proposed to include a section on alternatives. (Governments Exhibit 117). However, this outline, which was discussed with Mr. Lunt in February, 1974, did not list or discuss specific available alternatives.

In January, 1974, the Superior National Forest issued the *BWCA Management Plan . . . Public Involvement Report* prepared by the planning team. (Governments Exhibit 37). The report includes two parts. Part I discusses public involvement activities conducted by the Superior National Forest during 1972 as they relate to the preparation of the BWCA Management Plan. Part II is a summary of the written public responses to the Draft Plan and Environmental Statement.

Between December, 1973 and January, 1974 the planning team began reviewing and developing new matrices, studying the impacts of each alternative activity and use and analyzing their effects.

During the week of February 12–15, 1974 the Forest Supervisor, his staff and the district rangers met to review the environmental analysis matrices prepared by the planning team and to make final recommendations for the Management Plan. At this meeting the statement of policy which appears in the Management Plan at P–18, regarding logging in the Portal Zone, was defined. That policy was that "Vegetation in the Portal Zone will not be reserved from cutting unless species or unique plant communities not found in the Interior Zone are involved." The minutes of the meeting for that week do not indicate that any consideration was given to the alternatives of eliminating logging in the virgin forests of the Portal Zone or

to any of the other alternatives, aside from the question of administrative cutting as a substitute for commercial logging and fire.

After the February 12–15 meetings Mr. Rice (forester) and Mr. Nebel (economist) reworked the matrices, prepared management alternatives and began drafting the Forest Service's recommendations for the Final EIS and Management Plan. At first, the planning team prepared four management alternatives which were presented to Regional Forester Cravens, along with maps and matrices, at a meeting in March, 1974. The Regional Forester's Office suggested two additional alternatives which appear as Alternatives 1 and 6 of the Final EIS. (Governments Exhibit 49). Thus, the six management alternatives (alternative packages) which appear in the Final EIS were not developed until late in the EIS development process.

The six management alternatives were presented to the President's Quetico-Superior Committee on March 21, 1974. The Committee offered a variation on Alternative 5 by adding "remote areas".

In addition, between April 3 and April 10, the six management alternatives were presented to the Ontario Ministry of Natural Resources, the Superior National Forest Advisory Committee, the Forest Supervisor in Duluth and the Rotary Club in Virginia, Minnesota.

On April 16, 1974 a meeting of all district rangers and staff was held in the Forest Service Office in Duluth. At this meeting the six management alternatives were presented and discussed and a decision was made to recommend Alternative 3 to the Regional Forester.

On April 29, 1974 a copy of a *Review Draft of Management Plan and Environmental Impact Statement* was delivered to Regional Forester Cravens which indicated that Alternative 3 was recommended.

On May 7, 1974 Regional Forester Cravens indicated that "Alternative 3 looks best". (Governments Exhibit 130).

On June 28, 1974, after final revisions and editing by Mr. Rice and Mr. Nebel, Regional Forester Cravens transmitted the Management Plan and EIS to CEQ. Subsequently, on July 11, the Forest Service published notice of the Final EIS and Management Plan in the *Federal Register* (39 Fed.Reg. 25524), and CEQ published a similar notice in the *Federal Register* on July 19, 1974. 39 Fed.Reg. 26477.

On August 19, 1974 MPIRG filed its motion to serve and file a third Amended Complaint challenging the adequacy of the EIS and seeking a declaration that the Wilderness Act prohibited logging in the virgin forest areas of the Portal Zone of the BWCA. This Court granted MPIRG's motion and also permitted the Sierra Club to intervene as a plaintiff.

On September 16, 1974 Regional Forester Cravens formally approved the Management Plan subject to conditions and changes listed in Governments Exhibit 133. [Incorporated at the front of the most recently printed EIS and Management Plans].

## III. THE EIS AND MANAGEMENT PLAN

### A. *In General*

An outline of the basic structure of the EIS and Management Plan provides a helpful background to the discussion, *infra* at 1299–1323 on the inadequacies of the EIS.

The EIS and Management Plan were prepared with respect to all aspects of management of the BWCA. Consequently, they deal with issues in addition to timber harvesting and related activities. The existing timber sales are not extensively evaluated in the EIS but rather are evaluated in individual EARs,

prepared for each timber sale.[8] A difficult problem in evaluating the EIS has been the contradictions in policy between the EIS and Management Plan and within each of them. However, the federal action evaluated in the EIS was used to prepare the Management Plan, therefore the policies contained in the Management Plan are presumably those which will be implemented by the Forest Service.

### B. *The EIS*

The BWCA EIS is divided into five parts not counting the Summary Sheet, Introduction, Management Plan, or Appendixes.

The "Summary Sheet" states that the EIS is a Final EIS, prepared by the Forest Service, and that the type of action is administrative. This is followed by a brief description of the action which for the most part is a restatement of the policies contained in the Management Plan at P–2–P–4. (EIS at 1–4). Next, is a brief summary of environmental impacts and adverse effects, followed by a list of the six management alternatives. (EIS at 4–10). The Summary Sheet ends with a paragraph about consultation with the public and outside agencies during the preparation of the EIS and Management Plan and the dates on which the Draft and Final EIS were made available to CEQ and the public. (EIS at 10–11).

The Introduction contains a brief statement about the "unique" quality of the BWCA, recites that the proposed action addressed in the EIS is a Land Use Management Plan for the BWCA, that the plan contains major departures from current management practices which will have impacts upon the environment, and recites that "Alternative 3 is proposed as offering the best current solution to the needs of 'use' and 'preservation'". (EIS at 13). The Introduction ends with a brief statement about what is contained in the following six chap-

---

8. See footnote 7, *supra*.

ters, Chapter VI being the Management Plan. (EIS at 12–14).

Chapter I is a description of the area, environment, resources, associated values and beneficial uses of the BWCA.

Chapter II traces the history of the area and how historical events have, over the past 130 years, specifically influenced the treaties, laws, and regulations that currently govern the administration and use of the area. This chapter concludes with a synopsis of the major laws governing management of the area and planning areas adjacent to the BWCA, whose use is affected by, and which affect the BWCA.

Chapter III presents the six "Packages" of management alternatives, including maps. These are followed by a one page evaluation of the comparative advantages of the alternatives and a fold out comparison chart. These alternatives are packages of various policies for numerous management activities and uses. (The Alternatives are included as Appendix C of this opinion, excluding maps).

The Alternatives, comparison chart, and statement of comparative advantages of the alternatives are followed by sections which discuss the "Unavoidable Adverse Impacts of the Alternatives", the "Relationship Between Short-Term Uses and Long-Term Productivity for Each Alternative", and the "Irreversible Commitments and Irretrievable Losses of Resources" under each alternative. Ending the chapter is a comparative evaluation and discussion of the alternatives in terms of how they respond to "National Interests and Goals" (primarily NEPA policies, the special BWCA provision of the Wilderness Act 16 U.S.C. § 1133(d)(5), and laws and treaties relevant to BWCA management in general). Again these are package evaluations of numerous policies for individual activities and uses. The package evaluation of alternatives is a major inadequacy in the EIS as will be discussed, *infra* at 1317–1319.

Chapter IV is an environmental analysis that reflects potential effects of the various activities and uses which have been suggested for the BWCA and suggests how some of the adverse effects might be mitigated. This is the heart of the evaluation of environmental impacts. This chapter contains seven fold-out matrices which state, *without discussing*, the impacts of various management activities and uses upon environmental factors grouped as physical, biological, cultural, or economic. The matrices which evaluate the impacts of commercial timber harvesting is included as Appendix B to this opinion. As will be discussed *infra* at 1319–1323, the failure of the EIS to give any clue as to how the impacts in the matrices were assigned and determined to be adverse or favorable; major or minor; long-term or short-term; direct or indirect, is another major inadequacy of the EIS.

Chapter V is a summary of public participation, responses to the draft EIS and the Forest Service comments on the major issues raised.

Chapter VI is the Management Plan.

### C. *The Management Plan*

The Management Plan states that it is designed to provide management direction for at least ten years. (Management Plan at P–4). Testimony indicated that 10 years is close to the expected life of the EIS and Management Plan. (Transcript 1384–1390, 2023).

Since the Management Plan derives its environmental information from the EIS, a new management plan would require an accompanying EIS.

This plan replaces the previous BWCA Management Plan formulated by the Forest Service in 1964 and amended in 1966 in an attempt to comply with the Wilderness Act, 16 U.S.C. §§ 1131–1136, and Secretary of Agriculture's regulations governing the BWCA. 36 C.F.R. § 293.16. (formerly 36 C.F.R. § 251.85).

The Management Plan is divided into three sections. First is the Introduction

which is, for the most part, a restatement of the EIS Summary Sheet. (EIS at 1–4).

Second is the Implementation Section which explains that the plan will be used to revise the current BWCA Management Handbook.

Third is the Resources and Activities Section. This section is the main body of the Management Plan. It describes management assumptions, directions and policies governing the treatment of Fifteen resources and activities including vegetation.[9]

## IV. VEGETATION MANAGEMENT TOOLS

A good portion of this Court's discussion of the inadequacies of the EIS will concern the use of logging, as opposed to various other management tools available to the Forest Service, in managing the forests of the BWCA. A brief discussion of the available management tools and how they will be used in the BWCA Management Plan follows. While this discussion may at some points seem unclear, this is in large part attributable to the numerous ambiguities and contradictions in policy which this Court found to exist throughout the EIS and Management Plan.

The Forest Service has five basic tools with which to manage the vegetation in the BWCA; they are: logging, burning, administrative cutting, herbicides, and neglect (simply doing nothing with the exception of attempting to control wildfires).

A. *Logging*—The Management Plan states that the two-zone system for regulating the harvesting and removal of timber will be continued. Commercial logging will not be allowed in the Interior Zone but will be permitted in the Portal Zone subject to the restrictions of the Shipstead-Newton-Nolan Act, 16 U.

S.C. § 577a. Timber within 400 feet of the shorelines of lakes and streams suitable for boat or canoe travel, or any portage connecting such waters, will be specifically excluded from harvesting. Harvesting operations are to be designed to avoid unnecessary crossings of portages. (Management Plan at P–16). Additionally, timber sales plans are to incorporate suitable provisions for prompt and appropriate cover restoration. Finally, an EAR will be made of each new sale. *Id.* EARs were prepared on the existing timber sales in April 1973. (Governments Exhibits 40–46).

B. *Burning*—The Forest Service has concluded that burning is not an acceptable management tool for the Portal Zone except as a supplement to logging. (EIS at 86, Management Plan at P–3, P–46, P–47). Fire is nature's tool for managing the forests of the BWCA. The BWCA is a fire dependent ecosystem; therefore fire is the best method of insuring that the processes of change in the forest follow as closely as possible those employed by nature. (1973 Opinion, 358 F.Supp. at 609–617) (Management Plan at P–45).

The Management Plan provides that prescribed burning will be permitted for treating logging slash and to manipulate vegetation. (Management Plan at P–3, P–47). Furthermore, the present fire prevention and detection program will be continued with some limitations on the use of motorized equipment, chemical retards and overland transportation of personnel and supplies. *Id.* Finally, some pre and post season wildfires will be allowed to burn if they can be quickly contained. *Id.*

Prescribed burning is defined in the appendix to the Management Plan as follows:

> *prescribed burning*: Controlled application of fire to wild-land fuels in

---

9. These resources and activities are as follows: soil; water; minerals and common variety materials; vegetation; wildlife and fish; land status, acquisition and exchange; recreation; land occupancy and airspace control; travel; research; insect and diseases; fire management; historical/archeological; visual resource; and administrative activities.

either their natural or modified state, under such conditions of weather, fuel moisture, soil moisture, etc., as allow the fire to be confined to a predetermined area and at the same time to produce the intensity of heat and rate of spread required to further certain planned objectives of silviculture, wildlife management, grazing, fire-hazard reduction, etc. NOTE: It seeks to employ fire scientifically so as to realize maximum net benefits with minimum damage and at acceptable cost. (Management Plan at A–59).

This basically means that fire can be used either to treat logging slash or to manipulate vegetation. (Management Plan at P–47). In other words, burning can be used as a vegetation management tool by itself, with only administrative cutting around the area to be burned to create fire breaks, or in connection with burning slash after logging has occurred. The evidence showed that burning can be developed as an effective management tool within the next 10 years. *See* discussion *infra* at 1302.

C. *Administrative Cutting*—The Forest Service proposes to allow "Administrative Cutting" of timber in the Portal Zone and Interior Zone as a vegetation management tool.

At the 1974 trial the plaintiffs were much concerned that large areas of the Portal Zone and possibly the Interior Zone might be logged under the guise of "administrative cutting".

The EIS defines administrative cutting as simply non-commercial cutting. (EIS at 102). The Management Plan however, as revised by Regional Forester Cravens' letter approving the Final EIS and Management Plan, will only "permit administrative cutting of vegetation for the development and maintenance of campsites, portages, trails, for fire control, to aid prescribed burning, and for user safety." Management Plan at P–18 as revised by Cravens' Letter (Governments Exhibit 133).

The EIS contains an additional policy not specifically referred to as administrative cutting but which this Court must assume amounts to administrative cutting because it is "non-commercial cutting". This policy would allow vegetation to be cut in both the Interior and Portal Zones to clear areas for campsites, trails, portages, for public safety, *for fire management,* and *in the suppression of insects and diseases.* (EIS at 86). If this policy is in fact still in force as a supplement to administrative cutting as defined in the Management Plan then this court might be faced with a substantial problem because there is no indication as to just how much timber could be cut to suppress insects and diseases or whether the suppression of insects and diseases also includes preventative measures (i. e. cutting old trees because they could become infested with insects or disease). This Court must assume that the policy of administrative cutting as defined in the Management Plan at P–16 as amended by Regional Forester Cravens' letter (Governments Exhibit 133) is the only type of cutting, other than commercial logging in the Portal Zone, which is to be allowed in the BWCA.

D. *Herbicides*—The Management Plan provides that, "herbicides will not be used to manipulate vegetation unless there is a clear need to use them to ensure desired stand composition and then only with Regional Forester approval." (Management Plan at P–18). This policy however has been modified by Chief of the Forest Service McGuire to provide even greater protection against their unnecessary use. Reviewing the herbicide policy for the BWCA Chief McGuire commented as follows:

While the use of herbicides is not specifically prohibited in the Wilderness Act, herbicide use does not seem to be generally in keeping with wilderness philosophy nor is it necessarily consistent with the management of primitive conditions. As such I believe the use of herbicides should be approved

only when no other method of attaining the desired results is practical. The Regional Forester is instructed to consider this reasoning when considering granting approval for the use of herbicides in the BWCA. (Administrative Review–1974 BWCA at 15).

E. *Neglect*—The Interior Zone will be managed primarily by neglect until in the opinion of the Forest Service burning can be safely used as a management tool. (Management Plan at P–18, P–46). The development of burning as a management tool, as will be discussed *infra* at 1302, will take approximately 10 years. The Interior Zone will contain primitive enclaves, the most primitive type of area in the BWCA. The EIS provides that in primitive enclaves burning will be used almost exclusively as the management tool. (EIS at 9, 111).[10] In these areas the forces of nature will be duplicated whenever possible. *Id.*

## V. NEPA

A. *The Act*

In 1969, Congress responding to growing public concern over our environment passed the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347, effective January 1, 1970.

In adopting NEPA Congress resolved not to allow Federal agencies or funds to be used in a predatory manner so far as the environment is concerned. *Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept.*, 400 U.S. 968, 978, 91 S.Ct. 368, 27 L.Ed.2d 388 (Douglas, J. Dissenting from denial of certiorari); *Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289, 294 (8th Cir. 1972), *cert. denied*, 409 U.S. 1072, 93 S.Ct. 674, 34 L.Ed.2d 661 (1972) [*E. D. F. v. Corps*].

Congress declared the purposes of NEPA to be as follows:

To declare a national policy which will encourage productive and enjoya-ble harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and bisophere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality. 42 U.S.C. § 4321.

Section 101 of NEPA (42 U.S.C. § 4331) is a Congressional declaration of national environmental policy. Section 101(a) is a general statement of policy and Section 101(b) requires the Federal Government to use all practicable means to achieve specific policy goals stated therein. Section 101 reads as follows:

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environment quality to the overall welfare and development of man, declares that it *is the continuing policy of the Federal Government,* in cooperation with State and local governments, and other concerned public and private organizations, *to use all practicable means* and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, *to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.*

(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable

10. This policy is not carried over into the Management Plan. However it is listed in the Summary Sheet under selected Alternative 3. (EIS at 9).

means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment. 42 U.S.C. § 4331. (Emphases added).

Section 102 of NEPA (42 U.S.C. § 4332) contains specific procedural directives which Federal agencies must follow in preparing the EIS and implementing the policies of NEPA § 101. Section 102 reads as follows:

The Congress authorizes and directs that, to the fullest extent possible: (1) *the policies, regulations, and public laws of the United States shall be interpreted and administered in ac-*

*cordance with the policies set forth in this Act,* and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) The environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of

such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, [United States Code,] and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment; (42 U.S.C. § 4332). (Emphasis added).

The provisions of NEPA are supplemented by CEQ guidelines for the preparation of EIS, 40 C.F.R. § 1500, and Forest Service Guidelines for Environmental Statements, 38 Fed.Reg. 31922.

B. *Standards for Review of EIS*

■ In evaluating the adequacy of the Forest Service's EIS for the BWCA this Court cannot substitute its judgment for that of the Forest Service in deciding to allow logging and logging related activities within the Portal Zone of the BWCA. This Court is limited to a review of whether or not the Forest Service acted within the scope of its authority and whether the decision it reached was arbitrary, capricious, an abuse of discretion, or otherwise not in accord with the law. *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136

(1971); *E. D. F. v. Corps,* 470 F.2d at 300.

■ The Standards of review for Environmental Impact Statements was set forth by the United States Court of Appeals for the Eighth Circuit in *E. D. F. v. Corps,* as follows:

Where NEPA is involved, the reviewing court must *first determine if the agency reached its decision after a full, good faith consideration and balancing of environmental factors. The Court must then determine, according to the standards set forth in §§ 101(b) and 102(1) of the Act, whether "the actual balance of costs and benefits that was struck was arbitrary or clearly gave an insufficient weight to environmental values."* Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, supra,* 146 U.S.App.D.C. 33, 449 F.2d 1109 at 1115.

Although this inquiry into the facts is to be searching and careful, the ultimate standard is a narrow one. The court is not impowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 824. *Id.* at 300 (Emphasis added). 470 F.2d at 300.

■ In determining whether or not the Forest Service acted in good faith compliance with NEPA § 102, the test is one of good faith objectivity rather than subjective impartiality. *E. D. F. v. Corps,* 470 F.2d at 296.

C. *Important Planning Considerations*

It is of paramount importance that the planners of this EIS should be mindful of the wilderness purposes of the BWCA as stated in the special BWCA provision of the Wilderness Act. It provides as follows:

Other provisions of this chapter to the contrary notwithstanding, the *management of the Boundary Waters Canoe Area, . . . shall be* in accordance with regulations established

by the Secretary of Agriculture *in accordance with the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, the primitive character of the area,* particularly in the vicinity of lakes, streams, and portages . . . . 16 U.S.C. § 1133(d)(5). (Emphasis added).

It is also important for the planners of the EIS to be concerned with the detrimental effects that logging can have upon the primitive character of the BWCA, and how these effects can vary greatly depending upon the type of logging which is conducted and the manner in which reforestation is accomplished. This Court devoted considerable attention to this subject in its 1973 opinion, 358 F.Supp. at 609–617.

With this in mind this Court can now turn to evaluating the EIS in terms of whether or not it contains a full, good faith consideration and balancing of environmental factors as required by NEPA.

## VI. THE INADEQUACIES OF THE EIS

The inadequacies of this EIS are difficult to categorize. However, for convenience in presentation, the discussion has been divided into three sections. The first section is titled "Failure to Describe the Proposed Action and to Evaluate Its Impacts". This section deals with the basic failure of the EIS to clearly describe the Forest Service's vegetation management policy both in terms of its ultimate goal and in terms of how logging will be used to accomplish that goal, with a minimum of adverse environmental effects. The second section is titled "The Determination of Impacts". This section discusses the general inadequacy of the matrices method employed by the EIS to identify environmental impacts. Additionally, this section discusses the failure of the EIS to adequately consider: the loss of virgin timber; the compatibility of logging with research, recreational, and ed-

ucational use of the BWCA; and the potential for environmental damage if mineral exploration and extraction must be permitted in the BWCA. The third section is titled "Alternatives to the Proposed Action". This section deals with inadequacies inherent in the method used by the Forest Service to formulate and compare six alternative management proposals. This section will demonstrate that the vegetation management policy of Alternative 3 (the alternative supposedly selected as the management plan) could not logically be chosen as the superior vegetation management policy from the information contained in the EIS.

### A. Failure To Describe The Proposed Action And To Evaluate Its Impacts

NEPA requires that the EIS consider the environmental impact of the proposed action, NEPA § 102(2)(C)(i), and any adverse environmental effects which cannot be avoided should the proposal be implemented, NEPA § 102(2)(C)(ii).

■ Obviously, before the impact of the proposed action can be evaluated the action must be described with sufficient clarity to make a detailed statement of evaluation possible.

### 1. Failure to Describe Ultimate Goal of Vegetation Management Policy

■ A prerequisite to evaluating the impacts of a proposed action is a clear statement of the objective of the action. This EIS and Management Plan unfortunately contain a very ambiguous policy from which a reader could conclude that the Forest Service intends anything from attempting to duplicate conditions in the forest which resembles nature as nearly as possible, to managing the Portal Zone as a tree farm for the production of commercial timber. Such a broad and ambiguous policy makes adequate evaluation of its impacts impossible.

The Management Plan states that the policy of vegetation management in the

BWCA is to *"maintain the primitive character of the area,* the variety of plant composition, and the diversity of vegetation communities". (Management Plan at P–15). Additionally, the Management Plan provides that "severance and removal of vegetation is allowed under sound principles of forest management to obtain *healthy, near natural ecosystems* and done in such a manner *to minimize adverse effects on the* primitive character of the area". (Management Plan at P–15).

At first glance, it might seem that the Forest Service intends to manage vegetation by using the best method possible to preserve primitive conditions. A closer reading, however, reveals that the policy of the Forest Service is in fact to produce commercial timber in the Portal Zone regardless of the fact that other methods of vegetation management would produce more natural results.

The cornerstone of the Forest Service's vegetation management policy is supposedly "to maintain the primitive character of the area" as provided for in the special BWCA provision of the Wilderness Act. 16 U.S.C. § 1133(d)(5). To this Court, maintaining the primitive character of the area means to preserve those conditions which exist in nature. To the Forest Service, maintaining the primitive character of the area has a different and changing meaning throughout the EIS.

On the one hand, the Forest Service has concluded that logging is consistent with maintaining the primitive character of the area. This is evident from the "Alternative Comparison-Goals" chart of the EIS at 117. Alternative 3, (the selected alternative) which would continue logging, is rated as better preserving and perpetuating the primitive character of the area than Alternatives 5 and 6, both of which would preserve all virgin timber from logging. (See Appendix C).

Fig. III–3 Alternative Comparison-Goals

| | Alternatives | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| (8) Preserve and perpetuate the primitive character of the area, particularly the lands with unique water-related characteristics in the vicinity of lakes, streams, portages and trails. (Responsiveness to values: 3 = best; 2 = average; 1 = least. See EIS at 113). | 2 | 3 | 3 | 2 | 1 | 1 |

———◆———

However, in other parts of the EIS "primitive" has a different meaning; in those parts, primitive is equated with prohibiting logging and Alternatives 5 and 6 are judged superior for purposes of preserving primitive conditions. For example, Alternative 5 is described as follows:

Alternative 5 puts greater emphasis on preservation of *primitive* conditions and less on economic than any previous alternatives. (EIS at 10, 91). (Emphasis added).

Alternative 6, which would completely prohibit any commercial logging, whether in virgin areas or previously cut areas, is similarly described in the EIS:

Alternative 6 gives maximum emphasis to the natural qualities of the BWCA and would provide the *most*

*primitive* recreation experience opportunities. (EIS at 10, 94). (Emphasis added).

Finally, the EIS describes Alternatives 5 and 6 as opposed to the other four Alternatives as favoring the primitive experience. (EIS at 113).

The contradictions and inconsistencies apparent in the various uses of the phrase "maintaining the primitive character of the area" leads this Court to believe that it is not the Forest Service's vegetation management policy to preserve the primitive character of the BWCA, at least as this Court defines primitive character. The phrase "maintain the primitive character of the area" is used throughout the EIS to conveniently mimic the language of the special BWCA provision of the Wilderness Act, while the Forest Service's real objectives in its vegetation management policy remain elusive.

■ This Court must conclude that the objective of the Forest Service is, in fact, to produce commercial timber in the Portal Zone, regardless of the fact that other methods of vegetation management would produce more natural results (discussed *infra* at 1301–1302) and contrary to their disavowal of that purpose both in the Management Plan (at P–16) and at the 1974 trial. (Transcript 1368). The Management Plan further states a policy of maintaining the "variety of plant composition". This requires no more than that the Forest Service will make sure that logged-over areas have more than one type of tree when reforested.

Maintaining "the diversity of vegetation communities" is defined in the EIS as the number of species present, the number of different communities and the size and distribution of stands". (EIS at 129). This merely states the Forest Service's intention to reforest logged-over areas with many different types of vegetation, not necessarily those which existed in nature.

Allowing logging to obtain "healthy, near natural ecosystems" suggests that in fact the Forest Service is going to allow logging only to duplicate nature as nearly as possible. The Management Plan enforces this assumption by stating that "[v]egetation will not be managed primarily to produce a sustained yield of commercial forest products". (Management Plan at P–16). However, if one searches long and hard enough he will discover that the policy of duplicating nature as nearly as possible, if it is still a policy at all,[11] is reserved for remote areas in the Interior Zone. (EIS at 9, 111).

That Policy provides as follows:

> In the remote areas, the vegetation management prescription would be to replicate as nearly as possible the agents of change before the coming of white man—*primarily fire* . . . . (EIS at 111). (Emphasis added).

It would appear from the evidence that if the Forest Service intended to preserve the forest in as natural a condition as possible, it would have used fire and neglect, but not logging, as management tools.

■ Using fire as a method of replicating nature is consistent with the fact that the BWCA is a fire dependent ecosystem, and with this Court's conclusion in its 1973 opinion, which is reinforced by the 1974 trial, that fire is the only management tool which will preserve conditions as they exist in nature. 358 F.Supp. at 610. (Management Plan at P–13, P–14).

Furthermore, the matrices which evaluate environmental impacts acknowledge that timber harvesting is not compatible with the natural laboratory, while fire is compatible. (EIS at 122). (Appendix B this opinion). Unfortunately the matrices leave a blank space where the effects of no manipulation on the natural laboratory should be listed.

The Management Plan recognizes the inconsistency of logging and maintain-

11. *Id.*

ing natural conditions because it directs that "research programs that require natural *or near natural* ecosystems" will be conducted in the Interior Zone. (Management Plan at P–43).

This Court rejects the Forest Service's argument that logging is necessary in the Portal Zone because fire is not as yet a workable management tool. While the evidence showed that development and implementation of a fire management program may take 10 years, the forests of the Portal Zone can wait for 10 years or much longer before there would be any significant damage to the forest by neglect. (Transcript 118, 922–924, 1880, 2055–2056). It must be remembered that the Interior Zone will be managed primarily by neglect and will have to wait for the development of fire as a management tool.

The evidence shows that there is no substantial difference between the forests of the Portal Zone and the Interior Zone. (Transcript 2021–2022). The Interior Zone can wait for fire as a management tool and so can the Portal Zone. (Transcript 118).

This Court finds that it is not in fact the Forest Service's policy to use the best management tools available to duplicate conditions as they exist in nature. This could be best accomplished by fire or neglect. 358 F.Supp. 609–617. Logging on the other hand destroys any possibility of replicating nature. *Id.*

This Court must conclude based upon all of the evidence that it is the unstated policy of the Forest Service to produce commercial timber, and furthermore, that the foregoing collection of policy statements are ambiguous and in many instances tend to mislead this Court and the reader of the EIS into thinking that logging is being used only because it is the best management tool for preserving the forest in its natural state. In effect, this policy suggests that the best way to preserve the primitive character of a virgin forest is to destroy it by cutting it.

*Conclusion:*

The EIS and Management Plan contain vague and contradictory policy statements concerning the Forest Service's goals of vegetation management. The EIS is inadequate under NEPA § 102(2)(C)(i) because it does not describe the goal of vegetation management policy with sufficient specificity to allow the impacts of the proposed action to be evaluated. The impacts of logging with a goal of replicating nature would be substantially different from the impacts of logging with a goal of producing commercial timber.

Additionally, the failure of the EIS and Management Plan to state a clear and unambiguous policy does not allow the public to understand how the Forest Service's policy of vegetation management departs from a policy of preserving conditions which exist in nature. This, therefore, does not fulfill that requirement of NEPA which requires that the EIS provide a basis for critical evaluation by those not associated with the agency. *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 851 (8th Cir. 1973) [*Iowa Citizens v. Volpe*]; *Environmental Defense Fund v. Froehlke*, 473 F.2d 346, 351 (8th Cir. 1972) [*E. D. F. v. Froehlke*].

Finally, the EIS fails to consider the alternative of suspending commercial timber harvesting in virgin forest areas pending the development of a viable fire management program. The alternative to forest renewal by prescribed, controlled burning needs extensive research and development. As discussed *supra* at 1302. The testimony of fire-behavior specialist indicates that a successful fire-management program utilizing fire for the purpose of renewing the forest in the most natural manner, can be initiated in the BWCA in 5 to 10 years. It would seem prudent, therefore, that destruction of the irreplaceable resource of virgin timber be stopped until such a management alter-

native is explored and developed. At a minimum this alternative should have been discussed at length in the EIS, for it is at the heart of the issue of vegetation management. However, the EIS does not discuss such a course of action as an alternative, and this failure violates NEPA § 102(2)(D) which requires all agencies of the federal government to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources", and NEPA § 102(2)(C)(iii) which requires that the EIS include "alternatives to the proposed action".

2. *Failure of EIS to Evaluate the Vegetation Management Policy Adopted in Management Plan*

 The Forest Service claims to have adopted EIS Management Alternative 3 as its management policy. (EIS at 85). However, somewhere between the decision that Management Alternative 3 was the superior management alternative and its implementation in the Management Plan, the policy of preserving virgin timber was radically altered. The EIS (selected Alternative 3) evaluated a plan directed toward preserving most virgin timber in the Portal Zone, while the Management Plan adopted a policy of cutting all or nearly all of it down.

The Management Plan states that "[v]egetation in the Portal Zone will not be reserved from cutting unless species or unique plant communities not found in the Interior Zone are involved." (Management Plan at P–18). (Emphasis added). The EIS, however, provides that "[v]irgin areas in the Interior Zone and most of those in the Portal Zone would be reserved from harvest, but some Portal Zone virgin timber would be logged to facilitate management of the area." (EIS at 86). (Emphasis added). Additionally, a portion of the EIS which is designed to respond to public needs and concerns over vari-

ous policies of management in the BWCA states the logging policy for the Portal Zone as follows:

Do not log in "virgin" areas. The Forest Service agrees that there is a need to protect much of the remaining "virgin" timber in the BWCA. One major problem is that a great amount of virgin forest lies within the Portal Zone, and much of the previously cutover land is in the present Interior Zone. . . . While all of the virgin area in the 618,000-acre Interior Zone will be left undisturbed and the virgin area in the Shipstead-Newton-Nolan portion of the 412,000-acre Portal Zone will be likewise untouched, there will be circumstances in which, because of resource objectives, *some areas of virgin timber will have to be cut.* (EIS at 146). (Emphasis added).

The vagueness and ambiguity of the EIS and Management Plan as to how timber harvesting would be used as a vegetation management tool in the Portal Zone is amply demonstrated by noting a strange dichotomy. The Forest Service evaluated a general policy in the EIS which sought to preserve *most* virgin timber in the Portal Zone. Yet, in adopting Alternative 3 in the Management Plan the Forest Service came up with a much different policy which instead of preserving most virgin timber in the Portal Zone, will cut all of it unless there are some, *as yet unidentified,* unique plant communities or species not found in the Interior Zone. Evidence at the trial disclosed that the Forest Service has made no plans to search out and identify such species or plant communities and further indicated the belief of the Forest Service staff that such species and unique plant communities do not exist in the Portal Zone. This means, that under the Management Plan, it is likely that the entire Portal Zone would be cut.

Reading this EIS and Management Plan can be a very confusing experience for the reader interested in determining

the Forest Service's policy towards logging in the Portal Zone of the BWCA. If one reads the Management Plan he might expect that the Forest Service intends to log almost the entire Portal Zone. If one reads the EIS alone he might expect that the Forest Service intends to preserve almost all of the virgin timber of the Portal Zone. If one reads both EIS and Management Plan he might become totally confused as to what the Forest Service intends to do.

Testimony during trial reveals that the Forest Service, in fact intends to log in the Portal Zone according to the Management Plan Policy of preserving only unique species not found in the Interior Zone and cutting the remainder. This revelation, of couse, is of little or no use to the reader of the EIS and Management Plan. The grand design of NEPA did not contemplate that a lawsuit need be filed in order to obtain a clear understanding of the actual planned federal action. Yet in this instance it was necessary. It took weeks of examination of agency personnel to discover the true scope of their intended activity. This alone should demonstrate the impossible task faced by the public when attempting to read and comprehend the EIS and the Management Plan.

*Conclusion*:

The fact that the Management Plan could take a policy from the EIS which would preserve most virgin timber in the Portal Zone and restate it as a Management Policy which will cut all except unique species or plant communities, and thus cut most or all of the Portal Zone, amounts to a failure of the EIS to adequately describe the proposed action and to consider its impacts in violation of NEPA § 102(2)(C)(i). Additionally, since the policy adopted in the Management Plan was not evaluated in the EIS, it is impossible to identify adverse environmental effects which could otherwise be avoided. This violates NEPA § 102(2)(C)(ii). In effect, the vegetation management policy contained in the Management Plan was not evaluated in the EIS.

Furthermore, the EIS and Management Plan are ambiguous and could lead a reader to believe that the Forest Service intends to preserve most of the virgin forest area in the Portal Zone, when this is in fact not the Forest Service's intention. This is especially true if the reader of the EIS reads the Forest Service's message to the public, (EIS at 146) quoted *supra* at 1301–1302. This type of confusion has a lulling effect, upon persons concerned with the preservation of wilderness values and reduces public input into the NEPA process and therefore represents a failure to provide a basis for critical evaluation by those not associated with the agency, in violation of NEPA. *Iowa Citizens v. Volpe*, 487 F. 2d 849, 851. It flies into the teeth of NEPA to evaluate one course of action and to follow another.

3. *Failure to Develop an Overall Plan for the Selection of Logging Sites in the Portal Zone*

The EIS and Management Plan do not contain or evaluate a plan for logging site selection. They do not identify those areas in the Portal Zone which will be cut, nor the order in which they will be cut nor how many acres will be cut (either annually, during the 10 or so year lifetime of the Management Plan, or for any other time period).

The extent of the EIS evaluation of existing timber sales consists of two columns in one of the seven EIS matrices which compare the combined impacts of either continuing or discontinuing existing sales. (EIS at 122). (Appendix B this opinion).

In identifying impacts and attempting to mitigate the adverse ones, as required by NEPA § 102(2)(C)(i) & (ii), it is important that the BWCA EIS evaluate logging policy in the Portal Zone in two important respects:

1. the long-range policy of cutting over the Portal Zone over the next 50 to 100 years; and

2. the short-ranged policy of timber sales which will be made within

the 10 or so year life span of the Management Plan.

While the necessity of considering the impacts of the long-range policy of logging almost the entire Portal Zone is obvious, considering the impacts of short-range plans for logging, during the lifetime of the Management Plan, is of equal importance. Laws, regulations, and the Forest Service's attitudes affecting logging in the BWCA have frequently changed in the past with an ever increasing emphasis on preserving greater amounts of virgin timber from harvest. Additionally, future needs for virgin timber areas promise to increase as recreational, research, and educational use of the BWCA increases. The Forest Service must recognize that its Management Plan will be in effect for a relatively short period of time (10 or so years) and should be designed so that future generations of planners are not *unnecessarily* foreclosed from changing policies to accommodate changing needs. NEPA § 101(b)(1) requires that when a plan is developed that it be designed to insure the greatest flexibility possible for future generations consistent with achieving the purposes of the plan. In other words, unnecessary adverse impacts must be eliminated. (NEPA § 102(2)(c)(ii)). In the BWCA this means that if logging sites can be selected during the life of the plan in a manner that will allow for proper vegetation management and still not interfere with potential recreational, scientific and educational uses which future planners may wish to develop then this is the way the plan must be developed and evaluated. If the entire Portal Zone will be cut over, then it would make little difference where the first sales were made in terms of destroying recreational potential and potential for a scientific laboratory. However, should the policy of the next Management Plan change, either because laws or attitudes change or because more natural management tools such as fire are developed, then the Forest Service may find that the areas

which were cut during the lifetime of this plan have unnecessarily destroyed potential for recreational, scientific, and educational use. Unfortunately the EIS as it is now written gives no direction in choosing timber sales which will be made during the life of the Management Plan. This job is left to the Environmental Analysis Reports (EARs) to be made on each sale. However, as will be discussed *infra*, at 1306–1307 the EARs can only evaluate individual timber sales in isolation and cannot consider the cumulative impacts of timber cutting which will be conducted during the lifetime of the Plan. Furthermore, these EARs have only the vague policy of eventual cutover of the Portal Zone with which to work.

The evidence at the 1973 and 1974 trials showed that much of the Portal Zone of the BWCA has undeveloped potential for recreational, scientific and educational uses. Ever-increasing demands for more wilderness area are being made by scientists who need the natural laboratories a virgin forest provides, and by hikers, backpackers, cross-country skiers, fishermen and campers who value the unique wilderness experience which the virgin forest area has to offer. For example, the use of the BWCA by hikers and backpackers is increasing. (Plaintiffs Exhibits 240, 241). Opportunities for backpacking and hiking trails to meet the needs of these visitors exist in the Portal Zone. However, if logging and road building continue in remaining virgin areas, it will become impossible to locate desirable new wilderness and recreational trails on ridges. Such trails would simply provide a good view of logging roads and cut over area and hardly a primitive recreational experience. (Transcript 1702–1720).

The long-range plans for cutting over the Portal Zone would of necessity eventually interfere with most of these potential recreational, scientific and educational uses. However, short-range planning can be designed so as to preserve,

at least for the next generation of planners, (and possibly for many generations of planners to come) the opportunity to develop the majority of these potential uses. Identifying potential areas for recreation, research, and educational use is becoming increasingly important in the BWCA due to the large increase in visitor use. (25% increase from 1970 to 1973). (Management Plan at P–26). Restrictions designed to redistribute visitors will be implemented in 1975 to alleviate pressure on heavily traveled zones. (Management Plan at P–3). This will increase the use pressure on other areas of the BWCA including the Portal Zone. At present, damage to resources is occurring in the most heavily traveled zones. (Management Plan at P–26).

Additionally, demands for research areas are increasing and restrictions will have to be placed on this activity. (Management Plan at P–42, P–43). The Management Plan proposes to limit research which requires natural or near natural ecosystems to the Interior Zone. (Management Plan at P–43).

It is the Forest Service's position that the existing timber sales were adequately evaluated in individual EARs prepared in each of the existing sales in 1973, and that the EARs which will be prepared on future sales will adequately deal with the impact of those future sales. The EARs, however, are only capable of considering the impacts of an individual sale; they cannot evaluate the cumulative impacts of many sales.

The EARs have formats similar to the EIS. They purport to consider the impacts and alternatives involved in the cutting of any individual sale area. They would be valuable tools for evaluating how an area proposed for logging fits into the general EIS plan, if a general EIS plan existed. The Management Plan is simply to cut the Portal Zone. This is of no use in selecting logging sites and as far as preserving certain species and plant communities are concerned, these are not identified in the

Plan and in all likelihood they would not be recognized by Forest Service personnel preparing the EARs.

Using the EARs without the benefit of definite criteria for selecting areas for EARs evaluation amounts to selecting logging sites without any real idea of how the individual site fits into the overall impacts of logging as a whole. Again, the EARs look only to the individual sale; they are incapable of evaluating the cumulative impacts of a logging program over any period of time. Evaluating the cumulative impacts of long and short-term logging policy is the job of the EIS.

The Management Plan should have contained a logging policy which gave the EARs a clear statement of the goal of timber management with which to work. Additionally the Management Plan should have provided Forest Service personnel and the public with guidance in the form of how many acres of the Portal Zone should be cut in a given period of time, the logging methods and road building methods which should be used, and, most importantly, the general areas of the Portal Zone which should be cut first due to their lesser impact upon recreational, scientific, and educational use potential for future generations. Absent such guidance, Forest Service personnel charged with the task of preparing an EAR are as hopelessly lost in the BWCA as a tenderfoot scout without his compass.

*Conclusion:*

The BWCA EIS and Management Plan are written from the prospective of cutting over the entire Portal Zone, a proposition which will take 50–100 years to carry out, while the Management Plan will only be active for 10 or so years. This will unnecessarily foreclose future planning options for future generations of planners. The failure of the Management Plan to contain both a short-range plan to minimize adverse environmental impacts during the lifetime of the Management Plan as well as a

long-range plan for cutting over the Portal Zone, and the failure to have this plan evaluated in the EIS, violates NEPA § 102(2)(C)(i) & (ii) and it is contrary to the policy of NEPA that the agency "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." NEPA § 101(b)(1).

4. *Failure to Consider How Logging Operations Could be Conducted with Minimum Adverse Environmental Effects*

 Just as the impacts of logging will vary depending upon how much of the Portal Zone is cut and whether the areas cut are chosen according to a plan or merely selected in a haphazard fashion, the environmental effects of logging in the Portal Zone will also vary greatly depending upon the type of logging operation which is conducted.

The Management Plan says little more about how logging will be conducted than that mechanical equipment and slash burning will be used *as necessary,* to prepare the soil for planting or seeding following timber harvesting or fire. (Management Plan at P–6). (The EIS at 86, Alternative 3, contains a similar statement).

The EIS evaluates vegetation management by commercial timber harvesting as a singular activity. (EIS at 122) (Appendix B this opinion). The only restrictions upon logging which are suggested are as follows: not to use heavy equipment near Eagle/Osprey nests, not to work in visually *sensitive* areas, extend Shipstead-Newton-Nolan strip beyond 400 feet *as needed,* avoid *unnecessary* crossing of portages and *other recreational conflicts, minimize* road construction and design to *minimize* erosion problems, and seasonally restrict activities. *Id.*

These limitations for the most part are directions not to do any more damage to the area than is necessary. The EIS does not attempt to comparatively evaluate the various ways in which a logging operation can be conducted to avoid or minimize its many adverse environmental effects.

It is not sufficient for purposes of NEPA for the Forest Service to simply conclude that "logging" will be used as a vegetation management tool. Once the decision to use logging was made the Forest Service was obligated to consider how logging operations could be conducted to minimize their adverse environmental effects.

This Court's 1973 opinion goes to great lengths to evaluate how a logging and reforestation operation can be conducted with an eye towards minimizing adverse environmental impacts upon the primitive character of the area. 358 F. Supp. at 609–617.

This Court concluded that once an area has been logged, it cannot be fully returned to its natural state, although if proper methods of reforestation are used that result can be approximated to the untrained eye. 358 F.Supp. at 610. There are three reasons for this. First, nutrients removed from the forest with the wood during logging are lost. Second, tree stumps can remain for up to 50 to 100 years after logging. Third, the effects of logging roads and other improvements required for logging are extremely long lasting and may remain visible for many years after logging is finished. 358 F.Supp. at 610–611.

Finally this Court concluded its 1973 discussion of how greatly the impacts of all of the above activities can vary depending upon how the logging operation and reforestation are conducted by commenting as follows:

In conclusion, the Court finds that logging and the various reforestation methods which follow it destroy the primitive character of the area involved. *The amount of this destruction varies considerably depending on the type of logging operation and the reforestation methods used thereafter.* Thus, the effects vary from the nearly complete destruction when a highly mechanized logging operation is fol-

**1308**

lowed by the traditional form of rock raking and seedling planting or by "natural regeneration" to the nearly natural result of logging with chain saws followed by the prescribed burning of the spread slash. In the former areas, man and his work dominates, and the natural condition of the land is destroyed for thousands of years and perhaps forever. In the latter areas while man's intrusion is highly visible for many years, it virtually disappears over a longer period of time, at least to the untrained eye. However, in either case, the area loses forever its "primeval character and influence" and "natural conditions". 358 F.Supp. at 617. (Emphasis added).

■ Specifically with reference to reforestation this Court found that it is largely financed by the price paid by the purchasers of timber sales, yet the amount paid does not provide the Forest Service with sufficient funds to use the most effective reforestation techniques, or in some cases any reforestation techniques at all. 358 F.Supp. at 612. All of these findings have been reinforced by the 1974 trial and are hereby reaffirmed and adopted here.

This Court is genuinely surprised that the Forest Service's EIS and Management Plan, in light of this Court's pointing out the problem, make no attempt to compare the various methods in which logging and reforestation operations could be conducted so as to minimize the adverse environmental effects of logging upon the primitive character of the area. The Forest Service claims to be allowing logging because it is the best management tool and not for the purpose of producing commercial timber. If this is truly the case, then the Forest Service could have developed a plan which would use logging and at the same time produce a result which could at least attempt to minimize environmental damage and attempt to approximate the conditions that existed in nature before logging.

The evidence establishes that the Forest Service contemplates cutting the virgin forest in a manner which is most efficient for the timbercutters and which necessarily envisions the use of heavy construction equipment and giant bulldozers equipped with rockrakes and that the forest, once cut, will consist of a gridwork of long windrows of rocks and stumps which will last for generations and to some extent forever. The most efficient way of cutting the forest appears to be that way which causes a major impact upon the environment. Thus, despite the fact that the Forest Service disclaims using economic criterion or commercial timber yields in choosing its vegetation management policy, it has effectively done just that with a maximum of damage to the environment. This has not been put before the public in a manner that can be understood and appreciated.

*Conclusion:*

The EIS fails to consider how logging could be used as a management tool with a minimum of adverse environmental effects. If the Forest Service plans to log to obtain healthy, *near natural ecosystems* (Management Plan at P–15), then it could have chosen specific methods of logging and evaluated the impacts of those methods and come up with a plan which would have the least possible adverse impacts upon the forest, short of not logging at all. The failure of the EIS to consider the comparative impacts of various logging methods amounts to both a failure to consider adverse environmental effects which could be avoided in implementing the logging policy in violation of NEPA § 102(2)(C)(ii), and a failure to consider alternatives to the proposed action in violation of NEPA § 102(2)(C)(iii).

**B. *The Determination of Impacts***

■ 1. *Inadequacies of the Matrices Method of Determining Impacts* —NEPA § 102(2)(C)(i) requires that the EIS describe the impacts of

the proposed action. To accomplish this purpose agencies are encouraged to convey the information in a succinct form easily understood by the public and the decisionmakers. 40 C.F.R. § 1500.8b.

The Forest Service's tool for stating the impacts of each management activity and use are seven matrices. (EIS at 121–127). These matrices state the Forest Service's conclusions as to the impacts of the following management activities and uses: soils, water level management, minerals, vegetation management, wildfire, wildlife habitat, recreation activities, recreation facilities, land occupancy, historical and archeological, and travel network and entry points.

The environmental factors against which these management activities and uses are evaluated are grouped as physical, biological, cultural and economic. Matrix 2 (EIS at 122) covering vegetation management is of the most interest in this litigation and is reprinted as Appendix B of this opinion.

The matrices list the individual impacts of a particular management activity or use (such as vegetation management by commercial timber harvesting) upon each environmental factor (such as vegetation health and vigor).

The impacts of a particular management activity or use upon a particular environmental factor are indicated in most cases by a small circle on the matrices where the horizontal column of the management activity or use and the vertical column of the environmental factor intersect.

The circle is divided into four parts. Symbols are used to indicate the impacts in terms of whether they are: favorable or adverse (Letter A or F); direct or indirect (Letter D or I); major or minor (a blackened-in quarter circle for major or a letter M for minor); and as having long or short-term duration (Letter L or S). (See Appendix B this opinion).

In some cases, however, the circle is not used and in its place is any one of three letters indicating whether the particular management activity or use is compatible (C) or not compatible (N) or indeterminate (I) with the particular environmental factor. In some cases no impact is listed at all and the appropriate square is left blank.

The seven matrices are no more than a catalog of the Forest Service's unexplained conclusions as to the impacts of various management activities and uses. There is *no* explanation in either the EIS or Management Plan of how the impacts were determined; nor is there any explanation of the reasoning process or the criterion used to label any given impact as favorable or adverse, major or minor, of long or short-term duration, or as direct or indirect.

It cannot be said that the BWCA EIS "represents an accessible means for opening up the agency decision-making process and subjecting it to critical evaluation by those outside the agency, including the public" as required by NEPA. *Iowa Citizens v. Volpe,* 487 F.2d at 851; *E. D. F. v. Froehlke,* 473 F.2d at 351. To the contrary, the matrices require this Court and the public to accept the unsupported conclusions of the Forest Service as to the impacts of each and every activity and use evaluated in the EIS. This makes it virtually impossible for this Court or the Public to determine whether the Forest Service carefully evaluated each impact using reliable information or whether the matrices amounts to nothing more than "off-the-cuff" conclusions by members of the planning team designed to legitimize a preconceived decision to log.

Additionally, the matrices state seemingly illogical conclusions on impacts which are highly controversial

and then conveniently do not explain how they were determined.

For example, the matrices indicates that no silvicultural manipulation will have a favorable effect on the "natural succession process" while either continuing *or discountinuing* existing timber sales will have an adverse effect on this factor. (EIS at 122) (Appendix B this opinion).

Natural succession is defined in the EIS Appendix D as:

> The gradual supplanting of one community of plants by another; the sequence of communities being termed a *sere* and each stage *seral* (= successional). Succession occurs in all plant communities in the absence of disturbance. Disturbance such as logging or fire can set succession back to an early seral stage. (A–58).

Presumably, no logging should have a favorable effect upon natural succession because it is a form of non-manipulation (lack of disturbance). It is illogical that discontinuing existing sales should have an adverse effect upon natural succession, while no silvicultural manipulation would have a favorable effect. The reasoning behind the determination of this important impact remains unexplained because of the EIS' general failure to explain how the matrices impacts were determined.

*Conclusion:*

The Court of Appeals for the Eighth Circuit commented upon the requirement that the impact statement must explain fully its analysis and reasoning, as follows:

> The complete impact statement must contain more than a catalog of environmental facts, however. *The agency must also "explicate fully its course of inquiry, its analysis and its reasoning." Ely v. Velde,* 451 F.2d 1130, 1139 (4th Cir. 1971). Thus, the complete formal impact statement rep-

resents an *accessible* means for opening up the agency decision-making process and *subjecting it to critical evaluation* by those outside the agency, including the public.

Finally, the formal impact statement supplies a convenient record for courts to use in reviewing agency decisions on the merits to determine if they are in accord with the substantive policies of NEPA. 473 F.2d at 351. (Emphasis added).

While highly technical descriptions are unnecessary in the matrices, the EIS must at least include a general description of the reasons for each conclusion and a reference to backup data. The BWCA EIS fails to do so.

Judge Heaney in *Nelson v. Butz,* 377 F.Supp. 819 (D.Minn.1974), explained the EIS balance between clarity and brevity on the one hand and adequately analyzing environmental aspects on the other as follows:

> While agencies are encouraged by the law and regulations to convey the required information succinctly in a form easily understood (40 C.F.R. § 1500.8(b)) and to avoid "highly technical and special analysis" (40 C.F.R. § 1500.8(a)(1)), they must analyze unique and unusual environmental aspects of the project in the EIS. *General descriptions of unique aspects of the project can, of course, be used if backup data is attached as appendices or is included by reference with adequate bibliographic references.* (40 C.F.R. § 1500.8(a)(1).)
>
> This is not to say that the EIS must list every tree, bird, fish and shrub as the plaintiffs have urged. General descriptions, when supported by appropriate backup data, will suffice and such data should be attached as appendices or footnoted with adequate bibliographic references. 40 C.F.R. § 1500.8(a)(1). 377 F.Supp. 821–822. (Emphasis added).

The EIS should have at least contained a short paragraph describing how

each impact was determined and referring the reader to the source of the information used to reach the conclusion as to that impact. This Court cannot accept the argument that it would be too burdensome for the Forest Service to have disclosed its reasoning and information used in assigning each impact. While this might make the EIS longer it should not add significantly to the workload in preparing the EIS. Including a short explanation of how the impacts were arrived at is asking no more than that the Forest Service put in writing exactly what it claims to have worked out after careful consideration.

The matrices are the most important part of the EIS. They evaluate the environmental factors which are the basis of the comparison of the alternatives for vegetation management and ultimately the basis of the decision to choose the best vegetation management policy. Additionally, they identify adverse environmental impacts so that their effects can be mitigated wherever possible. This Court concludes that while the matrices provide a convenient summary of impacts, their failure to explain how the impacts assigned therein were arrived at or even to give any indication of the source of the information used to reach the conclusions is a violation of NEPA § 102(2)(C)(i) which requires that the EIS include a detailed statement on the environmental impact of the proposed action.

 2. *Failure to Consider Adverse Environmental Effects Associated with Loss of Virgin Timber*— NEPA § 102(2)(C)(v) requires that the EIS consider "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented".

The most important irreversible and irretrievable commitment of resources involved in logging in the Portal Zone is a loss of large blocks of virgin timber. Additionally, the loss of virgin timber is an adverse environmental ef-

fect which cannot be avoided if logging is implemented (NEPA § 102(2)(C)(ii)), and will effect the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity (NEPA § 102(2)(C)(iv).)

Logging of virgin timber involves an irreversible and irretrievable commitment of a valuable part of nature relatively untouched by man. Virgin timber has value for recreational, scientific and educational uses. The Court of Appeals opinion in *Butz* commenting upon this subject observed that logging destroys virgin forest not only for recreational use, but for scientific and educational purposes as well. All of these are significant impacts on the human environment. 498 F.2d at 1322.

Additionally, that opinion commented upon what is referred to as the "existence value" of virgin timber as follows:

> *Existence value* refers to that feeling some people have just knowing that somewhere there remains a true wilderness untouched by human hands, such as the feeling of loss people might feel upon the extinction of the whooping crane even though they had never seen one. *See, Conservation Society of Southern Vermont, Inc. v. Volpe*, [343 F. Supp. 761], *supra* at 767–768:

> To those of us who are so fortunate to live in Vermont and to have a little wildness surrounding us, it is probably not so difficult as it may be for others to conceive in terms of the preservation of all mankind of the importance of a little limestone hill rising abruptly from a valley floor, covered with basil and marjoram and creeping thyme, with columbine and yellow ragwort in dramatic abundance. The more so any of us find it difficult to conceive of the lasting, indeed the underlying importance of wetlands or bogs—

perhaps because understandably we do not recognize, or we wish to forget, our own insignificant beginnings in what Judge Learned Hand called the "primordial ooze." (footnote omitted). 498 F.2d at 1322 n. 27.

Despite the fact that the controversy which precipitated the EIS involves the preservation of virgin timber and despite the emphasis of both this Court and the Court of Appeals on the values of virgin forest for recreational, scientific, and educational use, the EIS matrices only evaluate the impact of logging in virgin forest as a loss of a "natural laboratory". (EIS at 122, 129). "Natural laboratory" refers to the value of the area for scientific research. (EIS at 132).

The EIS does not give any consideration to the value of virgin timber for recreational or educational use.[12] It is difficult for this Court to understand, in light of this protracted litigation, why the Forest Service should fail to consider the impact of cutting virgin timber as anything more than a loss of a "natural laboratory". The Forest Service merely recognizes the obvious, that when timber is cut in a virgin area its "virgin" character is irretrievably lost. (EIS at 101).

*Conclusion:*

Virgin timber has value for research, recreational, and educational use. Additionally, it is valuable merely because it represents an area relatively untouched by man.

The failure of the EIS to consider the loss of Virgin timber as anything more than a loss of a "natural laboratory" grossly undervalues virgin timber in the BWCA. The EIS fails to adequately consider: the irreversible and irretrievable commitment of the virgin timber resource which would be involved in the proposed action should it be implemented, in violation of NEPA § 102(2)(C)(v); the adverse environmental effects associated with the loss of virgin timber which cannot be avoided if the proposal to log is implemented, in violation of NEPA § 102(2)(C)(ii); and the relationship between short-term use of the virgin forest for wood production and the maintenance and enhancement of long-term productivity of the virgin forest for research, recreational and educational use and for its existence value, in violation of NEPA § 102(2)(C)(iv).

3. *Failure to Consider the Compatibility of Logging with Research, Recreational, and Educational Use of the BWCA*—Closely related to the failure of the EIS to consider how logging operations can be conducted during the lifetime of the Management Plan so as to minimize its adverse impacts is the more general failure of the EIS to consider the compatibility of logging in any form with increasing demands for research, recreational and educational use of the BWCA.

As discussed *supra,* at 1305–1306, the demand for areas in the BWCA for recreational, scientific and educational use is on the increase and in response to this increase in demand the Forest Service plans to restrict both visitor use and research. (EIS at 86, 144, 149) (Management Plan at P–31, P–42, P–43).

The EIS indicates that restrictions on recreation, and presumably research, are necessary to protect those

12. The Matrices do consider the general impact of commercial timber harvesting upon "primitive unconfined recreation". (EIS at 122) (Appendix B this opinion). "Primitive unconfined recreation", however, is provided according to the Forest Service, in areas which only have seasonal restrictions on timber harvesting. (EIS at 133). Therefore, since virgin forest is not deemed necessary for primitive unconfined recreation, this factor does not evaluate the impact of the loss of virgin forest as a loss of an area for primitive recreational experience. This merely confirms the fact that the Forest Service only considered virgin forest as having a value as a natural laboratory and that for any other purpose its loss is of no consequence.

qualities for which people come to the BWCA. Commenting on this subject the EIS states that:

It is anticipated that the user regulation and distribution plan will do more to redistribute visitors than to lower total use, although *total use will obviously not be able to grow indefinitely.* Nevertheless, such *regulation is necessary if the BWCA is to retain the qualities which attract people in the first place.* (EIS at 149). (Emphasis added).

At another point in the EIS the adverse effects of increased recreational use are stated as follows:

1. Trampling of soil, which destroys the protective "duff" layer and compacts the soil, decreasing its ability to absorb and hold moisture and increasing its susceptibility to erosion.

2. Direct deposit or leaching of human wastes into lakes adversely effects water quality.

3. *Heavy use inevitably leads to higher encounter rates among recreationists, and this in itself can lead to decreases in the "solitude" component of the recreation experience.* (EIS at 105). (Emphasis added).

While most of the immediate need for restrictions centers around the overuse of the Interior Zone, this is at least in part due to the failure of the Forest Service to develop recreational potential in the Portal Zone. Restricting research to the Interior Zone will further burden the ecosystems in that zone.

The EIS does not at any point squarely confront the problem of whether logging will be compatible with long-term needs for virgin forest areas for research, recreational and educational uses.[13] Yet the Forest Service acknowledges that the most fundamental purpose of reserving the BWCA is as a primitive type recreational area. (Management Plan at P–25).[14]

Instead of simply listing the increases in recreational activity in the past and concluding that user demands will increase in the future, (Management Plan at P–26, P–27), the Forest Service should have considered how eliminating logging in the Portal Zone might alleviate potential damage to an overused ecosystem as an alternative or supplement to user restrictions.

Because increasing recreational, scientific, and educational use is currently threatening the primitive character of the BWCA by causing damage to resources in the most heavily traveled zones (Management Plan at P–26) (EIS at 105), the Forest Service in the EIS should have clearly explained and evaluated whether or not logging, which will reduce available areas for these uses, will be compatible with the recreational emphasis of the BWCA and with maintaining the primitive character of the area as required by

13. The Matrices discussing vegetation management simply conclude without discussion that logging will have an adverse effect upon "primitive unconfined recreation" as opposed to not logging which will have a favorable effect. (EIS at 122).

14. The Matrices discussing recreation contain 16 blank spaces where the effects of various types of recreational activity upon the natural laboratory should be evaluated. (EIS at 124). The EIS evaluates the impacts of Management Activities and Uses on the virgin forest only under the category of natural laboratory. (EIS at 129). This Court has received no explanation as to why the Forest Service did not attempt to complete the Matrices Chart so that this Court and any other reader of the EIS could understand the impacts which these activities have upon the virgin forest. Yet it is obvious that camping, hiking, snowmobiling, cross country skiing, firewood cutting, motorboating, hunting, fishing, trapping, gathering forest products for pleasure, use of excursion boats and float planes, and houseboats, all have substantial impacts upon the virgin forest. (EIS at 124).

the special BWCA provision of the Wilderness Act, 16 U.S.C. § 1113(d)(5).

*Conclusion:*

The EIS fails to adequately evaluate the decision to log in the Portal Zone in the face of increasing user demands for areas for research, recreational and educational use, and therefore, fails to consider the environmental impact of the proposed action upon the loss of recreational, research and educational resources, and upon the primitive character of the BWCA through overuse, in violation of NEPA § 102(2)(C)(i).

■ 4. *Failure to Consider the Adverse Impacts of Potential Mineral Exploration and Extraction Operations in the BWCA*—The Management Plan prohibits exploration for and extraction of minerals to the extent permitted by law where determined to be incompatible with wilderness or other environmental values. (Management Plan at P–4, P–12).

The Management Plan recognizes the very substantial adverse impacts which mining would have upon the primitive character of the BWCA. With regard to this subject and the policy which will be implemented, the Management Plan states the following:

*Situation*

The presence of iron ore, copper-nickel, and other base metal deposits in the BWCA has been the subject of much interest, speculation, and concern. There is an iron deposit near the end of the Gunflint Trail within the BWCA boundary, but the copper-nickel sulfides are of most interest. (See Exhibit # 8).

*Limited exploration within the BWCA has indicated the probable existence of dispersed copper-nickel-sulfide mineralization similar to that existing in a zone south of the BWCA which is under active inves-*

*tigation for exploitable mineral deposits.* Such deposits have not yet been shown to be economically exploitable, but they may become so at some time in the future.

The most known common variety material is gravel. Deposits are found in limited quantity in isolated pockets, differing in volume and scattered according to no apparent pattern. There are some known deposits near the southernmost boundary of the BWCA.

*Subsurface ownership of mineral rights presents a serious problem.* The United States owns approximately 44% of the mineral rights within the BWCA, or 458,224 acres. The State of Minnesota owns the surface and has the mineral rights on approximately 26% of the land and under all navigable waters in the BWCA. *Any mineral exploration or extraction would jeopardize the surface resources and wilderness characteristic of the area.*

*The bonafide mineral rights owners argue they have a right to exercise their options of ingress and egress to explore for minerals or to determine the value of their mineral ownership.* Preservation and conservation groups disagree, and the matter was taken to court. On December 23, 1969, a complaint was filed in Federal District Court for a Declaratory Judgment and Injunctive Relief against owners of certain mineral rights and State and Federal officials to halt exploration and extraction of minerals in the BWCA. On January 5, 1973, *Judge Philip Neville issued a permanent injunction enjoining the defendants from exploring for and extracting minerals in the BWCA.* In rendering this decision he said:

: . . if the 1964 Wilderness Act means anything, the BWCA was established by Congress to secure for future generations the beauty, pristine quality and primi-

tiveness of one of the few remaining small areas of this country.

*Any use of the surface for the exploration or extraction of minerals becomes an unreasonable use because the surface is no longer wilderness and is irreversibly and irretrievably destroyed for generations to come. Mineral development thus by its very definition cannot take place in a wilderness area; else it no longer is a wilderness area.* [*Izaak Walton League of America v. St. Clair,* 353 F.Supp. 698, 715 (D.Minn.1973); reversed on administrative and procedural grounds, 497 F.2d 849, 853 (8th Cir. 1973); cert. denied, 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974)].

*Following an appeal, the decision granting the injunction was reversed and remanded by the Eighth Circuit Court of Appeals on May 17, 1974.* [*Id.*]

*Assumptions*

1. *Demands to explore for copper-nickel deposits will continue.*

2. Demand for gravel surfacing materials from within the BWCA for temporary roads, trails, and portages will continue.

*Management Direction*

1. *Mineral exploration and extraction will be prohibited to the extent permitted by law.*

2. Minimize construction and maintenance disturbances in utilizing gravel surfacing material.

*Policies*

*General*

1. *Exploration for, and the extraction of, minerals will be limited or prohibited to the extent permitted by law where determined to be incompatible with wilderness or other environmental values.*

2. Obtain sand and gravel from off-location sources in the BWCA for administrative use in dam, trail, and portage tread construction and repair. *Forest Supervisor approval* of site required when gravel is to be used for construction.

3. Pits will not be permanent and upon completion of use, promptly restore borrow areas to a near natural condition. (Management Plan at P–11, P–12).

The EIS acknowledges that the possible presence of precious and base metal deposits in the BWCA has been a subject of much interest, speculation and concern. Furthermore, the EIS recognizes that there are iron deposits near the end of the Gunflint Trail within the BWCA but that the copper-nickel deposits are of more significance. (EIS at 19). The major copper-nickel deposits are concentracted along the eastern edge of the three mile wide and ninety mile long Duluth Gabbro formation. (EIS at 19).

A comparison of the map of logging history showing the virgin forest areas (Management Plan Appendix B at Exhibit 5) and the map showing the Duluth Gabbro formation (Management Plan Appendix B, at Exhibit 8), shows that the formation runs through both the Portal and Interior Zones of the BWCA with the greater share underlying the Interior "no cut" Zone. In fact, the Duluth Gabbro formation bisects the largest block of virgin timber in the BWCA, most of which is in the Interior Zone. The logging history map and the map showing copper-nickel mineralization along the Duluth Gabbro formation is reprinted as Appendix A1 & 3 to this opinion.

The Forest Service has based its evaluation of environmental factors and resulting impacts upon the assumption that it can prevent mining in the BWCA. If ultimately mining is allowed, the cutting of large blocks of virgin forest in the Portal Zone will have a very great impact upon the primitive character of the BWCA. Some areas of virgin timber, particularly in the Interior Zone, may have to

be cut to facilitate mining. This will disrupt the very foundations of the "Portal" and "Interior" zone concepts.

Fragmentation of the remaining large contiguous blocks of virgin forest by logging or mining causes additional losses of scientific, educational and recreational values out of proportion to the actual acreage damaged. It is the large size of such blocks that makes them especially useful for studies of large-scale ecological factors and processes. (Transcript 683–708, 1952–1959), (Transcript (1973) 75–76, 129–130). Additionally the primitive recreational experience is at its peak in an area which does not require that trails or canoe routes cross roads, mining operations, or encounter other evidences of man.

In particular, the scientific value of large contiguous blocks of virgin forest has been enunciated by recent research. Such large areas are necessary in the study of various large-scale ecosystem processes, not only major forest fires, but also the behavior of populations of large mammals such as moose and wolf, and the development of homogeneous plant and animal populations by free exchange of genetic material without contamination from artificially disturbed areas. (Transcript 683, 1950–59), (Transcript (1973) 129–130, 1089–90, 1097–98).

At this point the status of private mineral rights and the power of the Forest Service to prevent mining in the BWCA has not been finally determined. *See, Izaak Walton League of America v. St. Clair,* 497 F.2d 849 (8th Cir. 1974), *cert. denied* 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974).

Finally, the matrix evaluations indicate that extracting minerals either by open pit or tunnel mining methods have a long-term adverse effect upon the biological factor of vegetation health and vigor, the natural succession process, wildlife habitat population, natural laboratory and the cultural factors of scenery, natural acoustics, and primitive unconfined recreation. (EIS at 122, Appendix B this opinion).

*Conclusion:*

The Management Plan based its decision to log in the Portal Zone upon the assumption that mining can be stopped in the BWCA. While this assumption may prove to be true, if the Forest Service must allow mining, particularly in the Interior Zone in the area of the Duluth Gabbro formation, this would have a disastrous effect upon the primitive character of the area and disrupt the Interior-Portal Zone concept. *See, Izaak Walton League of America v. St. Clair, supra,* 353 F.Supp. at 714–715.

The Forest Service has taken the position at trial that sufficient virgin timber (approximately 300,000 acres)[15] is being preserved in the Interior Zone to accommodate research, recreational, and educational uses in the BWCA. If virgin timber must be cut to accommodate mining and if large blocks of virgin forest are thus broken up and destroyed, then even by the Forest Service estimates there may not be sufficient virgin timber in the Interior Zone to justify logging in the Portal Zone.

This Court concludes that merely assuming that mining can be prohibited without considering the impacts of mining if it must be permitted upon the Interior-Portal Zone concept amounts to a failure to consider the impacts of the proposed action in violation of NEPA § 102(2)(C)(i), and a failure to consider a very substantial adverse environmental effect which *possibly* cannot be avoided should the proposal be implemented in violation of NEPA § 102(2)(C)(ii).

Additionally, NEPA requires that the impact statement contain alternatives to the proposed action (NEPA § 102(2)(C)(iii)) and furthermore that the agency

---

15. This figure was calculated from information appearing in the EIS at 1, 101 and 102.

"study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves *unresolved conflicts concerning alternative uses of available resoures.*" NEPA § 102(2)(D). (Emphasis added).

The conflict between logging, recreational, educational, and scientific use, and mining in the BWCA remains unresolved. The Forest Service should have considered the alternative of postponing the logging of virgin forest areas in the BWCA until the status of private mineral rights is finally determined. The failure to do so is a violation of NEPA § 102(2)(C)(iii) & (D).

### C. *Alternatives To The Proposed Action*

NEPA requires that the Forest Service consider alternatives to the proposed action. NEPA § 102(2)(C)(iii) requires that the EIS comment on alternatives to the proposed action, while NEPA § 102(2)(D) requires that the Forest Service "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources". "It is the essence and thrust of NEPA that the pertinent Statement serve to gather in one place a discussion of the relative environmental impact of alternatives." *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 834 (1972), *quoted with approval in E. D. F. v. Corps,* 470 F.2d 289, 296 (8th Cir. 1972).

Applicable CEQ Guidelines state the requirements for an adequate discussion of alternatives as follows:

> A rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects, is essential . . . .. Examples of such alterna-
> tives include: *the alternative of taking no action or of postponing action pending further study;* alternatives requiring actions of a significantly different nature which would provide similar benefits with different environmental impacts . . . .. In each case, the analysis should be sufficiently detailed to reveal the agency's comparative evaluation of the environmental benefits, costs and risks of the proposed action and each reasonable alternative. *CEQ Guidelines* dated August 1, 1973, 40 C.F.R. § 1500.-8(a)(4). (Emphasis added).

The Court of Appeals for the Eighth Circuit in *Iowa Citizens v. Volpe,* stated that: "The discussion of alternatives need not be 'exhaustive' but rather *need only provide sufficient information for a 'reasoned choice of alternatives'.*" 487 F.2d at 852.

1. *The Package Approach To The Alternatives*—The BWCA EIS evaluates alternatives by comparing six packages of unrelated management activities and uses. (EIS 79–96) (Appendix C of this opinion).[16] These packages contain policies for the following activities and uses:

a. *Zoning*—1) Land Use—One or two zones, depending upon whether all, part, or none of the BWCA would be cut and whether or not virgin timber would be saved, and; 2) Water Use—One to three zones, depending upon whether or not motors for water use would be allowed and motor size.

b. *Protection*—the type and amount varying between alternatives in terms of fire protection, protection from insects and diseases, protection of water levels, protection of users, and protection of air, water, soil and scenic qualities.

c. *Management of Vegetation for Products, Protection, Habitat, etc.*—policies varying with each alternative for timber harvesting, continuing or discontinuing existing timber sales,

---

16. This Appendix contains only the language of the alternatives and not the maps.

administrative cutting, mechanical treatment of vegetation, prescribed burning, and the use of herbicides.

d. *Recreation*—varying restrictions and provisions under each alternative for—use of motorized watercraft, off the road vehicles, snowmobiles, campsites, predominate experience levels, user controls, and mechanical portages.

e. *Roads, Trails, and Portages*—provisions for use and development under each alternative.

f. *Minerals*—restrictions, if any, under each alternative upon exploration for and extraction of minerals. (EIS at 79–96).

Thus, it is obvious that each alternative package is in reality a conglomeration of numerous policies for individual activities which for the most part are not interrelated nor dependent upon one another for success.

With respect to commercial timber harvesting, the alternatives are:

1. Permit commercial logging throughout the BWCA in the Interior and Portal Zone except where prohibited by Shipstead-Newton-Nolan restrictions. Logging in research and study areas would not be permitted. Existing timber sale contracts would be completed without changes.

2. The Interior and Portal Zones, as now designated, would be retained and commercial logging would be permitted in only the Portal Zone subject only to the Shipstead-Newton-Nolan Act and areas reserved for research, nature, and study areas. The existing timber sale contracts would be completed. Under this alternative, there would be no commercial logging in the Interior Zone.

3. The Portal-Interior Zone arrangement outlined in Alternative 2 will continue. Additionally, remote areas in the Interior Zone will be identified and retained without logging, motor routes, developed sites, or other activities or uses detrimental to the primitive experience. The existing timber sale contracts will be completed but subject to changes and modifications as recommended in the EARs.

4. Two zones in the BWCA but the areas included in the zones will be different than the present Interior and Portal Zones. One zone would include areas of the BWCA that have been previously logged and the other zone would include only virgin forest areas within the BWCA. There would be no commercial logging in the virgin forest areas but logging would be allowed in the previously logged areas except in Shipstead-Newton-Nolan Act, research, nature, and study areas. Existing timber sale contracts would be modified to avoid intrusions into remaining large blocks of virgin timber and in accordance with findings of the EARs. This alternative would require a change in the boundaries of the two zones, and would disrupt existing recreational and other uses in the Interior Zone.

5. The present Interior and Portal Zones would be retained; however, large blocks of virgin forests in the Portal Zone would be transferred to the Interior Zone. Thus, the Interior Zone would be enlarged under this alternative. Commercial logging would be allowed only in those portions of the Portal Zone which had been previously logged except in Shipstead-Newton-Nolan Act, research, nature, and study areas. The existing timber sale contracts would be changed to exclude blocks of virgin forests within the sale boundaries and modified in accordance with the findings of the EARs.

6. No commercial logging would be allowed anywhere in the BWCA and existing timber sale contracts would be canceled.

The management alternative selected by the Forest Service was Alternative 3.

These alternatives for timber harvesting are not separately evaluated in the EIS to determine which is the superior policy. Rather, the timber policy is

combined with the other policies described above with the result that packages rather than individual policies for management activities or uses are compared and evaluated against one another. Thus the conclusion that Alternative 3 is the superior alternative is in reality a conclusion that the combined policies contained in Alternative Package 3 are superior to any other package. It is not necessarily a conclusion that the timber harvesting policy of Alternative 3 is superior.

The vice of this package comparison is illustrated in the EIS discussion of the unavoidable adverse impacts under Alternative 6. This is the package which provides for not logging along with other policies. Not logging is here made to appear to be a poor management choice because it is grouped and evaluated with a collection of unrelated policies which are basically unacceptable. The EIS, for example, states that "[m]ajor unavoidable adverse effects would be most likely to be felt under Alternative 6 in that all existing dams would be allowed to deteriorate". (EIS at 101). Allowing dams to deteriorate will have a substantial adverse impact on the water levels necessary for maintenance of canoe routes. There is no logical reason why these dams should be allowed to deteriorate. Yet this unrealistic and undesirable alternative is considered as a part of a package that includes not logging. This unreasonable grouping tends to "stack the deck" so to speak against a fair consideration of Alternative 6 which is the only alternative which would permit no cutting of any timber at all.

In effect, this alternative dictates that if the forest is to be preserved by no logging then canoe routes must be destroyed. There is no logical necessity for having to make this choice.

The lack of dam maintenance is not the only factor which detracts from the desirability of Alternative Package 6. According to the EIS, Alternative 6, which calls for no insect and disease control, will result "in the greatest depredation effects". (EIS at 100). This means that even exotic diseases could not be controlled under this alternative. This limitation on taking even minimal action to preserve the forests in a healthy state detracts from the ecological desirability of Alternative 6. Furthermore, Alternative 6 would bar all motorboat use and therefore would have the effect of "virtually closing the [BWCA] to those unable to paddle their own canoes . . .". (EIS at 104).

Packaging the only policy alternative which will prohibit commercial timber harvesting with the above activities forces the planner who wishes to prohibit commercial timber harvesting to also choose to destroy major canoe routes, to exclude from the BWCA the weak and the old who cannot paddle a canoe, and to permit insect and disease epidemics. This can hardly be said to be a reasonable choice of alternative courses of action.

Additionally, the Forest Service has by this method of packaging alternatives succeeded in bifurcating the public attitudes and putting the various groups at odds with each other.

Those who love the canoe routes must oppose the no cutting package which is Alternative 6. Those who wish to use motorboats on the larger lakes likewise must oppose the no cutting Alternative 6 or their motorboats will be banned.

NEPA does not contemplate that the agency shall effectively "divide and conquer" for the obvious purpose of so diffusing the public input as to make it meaningless.

*Conclusion:*

▆▆▆ The technique of grouping together unrelated management activities such as timber harvesting and motorboat use and then simply choosing the "best" package insures that in all probability the best policy for management concerning each individual activity will not be chosen. This Court concludes that this package method of evaluation

is inadequate under NEPA § 102 (2)(C)(iii) because it does not provide sufficient information for a reasoned choice of the best alternative for each individual activity. *Iowa Citizens v. Volpe*, 487 F.2d at 852.

■ 2. *Alternative Comparison—* The method by which the packages of alternatives were compared is a collection of unexplained conclusions, or no conclusion at all, as to which alternative package is superior.

The first point in the EIS at which the alternatives are in any sense evaluated is in a 1½ page section titled "Comparative Advantages of the Possible Alternatives". (EIS at 97–98). This short section states the policy under each alternative with regard to setting up "cut" and "no cut" zones and to the preservation of virgin timber. It is more a statement of facts than an evaluation.

The heart of the comparison of the relative values of the alternatives is contained in the section titled "Unavoidable Adverse Impacts of the Alternatives". (UAIA) (EIS at 99–108). The UAIA section is a written comparison of the unavoidable adverse environmental effects under each of the six alternatives for a number of specific management activities and uses.[17] The specific activities and uses which have adverse environmental effects are determined from the Matrices. (EIS at 121–127).

The UAIA section does not attempt to evaluate the total adverse impacts of each alternative. It does not come to any conclusion as to which alternative, on the whole, is superior in avoiding adverse impacts.

The UAIA section on the other hand does discuss adverse impacts of logging as opposed to not logging in the BWCA. (EIS at 102). It does not however come to a conclusion as to whether logging or not logging is the better vegetation management policy.

The section of the EIS labeled "Relationship Between Short-Term Uses and Long-Term Productivity for Each Alternative" is a limited evaluation of the relative impact of the six alternatives. (EIS at 109–113).

This section attempts to evaluate the alternatives in terms of six values which the Forest Service concludes sum up the unique qualities of the BWCA which must be preserved.

The first part of this section is devoted to a brief description of each of the six values and how each alternative responds to it. These values are as follows: The Natural Beauty of Shorelines, Water Travel Network, Vegetation, Wildlife, Recreational Experience, and Research Opportunity. These descriptions are little more than explanations of what will happen under each alternative. There is no attempt to evaluate why a particular alternative is the best choice to preserve a particular value.

Following this discussion, the alternatives are numerically evaluated in a table in terms of whether they are best (3), average (2), or least (1) responsive to preserving a given value. These numbers are then totaled with the result that Alternative 3 comes out as the best alternative for preserving these six values.

This type of evaluation does not give the reader of the EIS even a vague idea as to the reasoning process behind the Forest Service's conclusion that in terms of preserving these six values Alternative 3 is superior. There is no explana-

---

17. These activities and uses are as follows: Fire Suppression, Insect and Disease Control, Protection of Water Levels, Mechanical Manipulation of Vegetation, Timber Harvesting, Not Harvesting Timber, Non-Commercial Cutting, Treatment With Heavy Equipment, Prescribed Burning, Herbicides, Wildlife, Motorized Watercraft, Snowmobiles, Recreation Use in General, Site Development, User Controls, Minerals, Temporary Roads, Trails and Portages, Motorized Mechanical Portages. (EIS at 99–108).

tion as to how the numerical values are determined, nor are they in any way related to the preceding discussion.

Comparing the values assigned to Alternative 3 with those assigned to Alternative 5 is instructive in showing the lack of a logical connection between the discussions and the values assigned, and in pointing up deficiencies in the values themselves.

Fig. III–2 "Comparison Evaluation of Alternatives on the Inherent Values of the BWCA" (EIS at 113) assigns the following values to Alternatives 3 and 5:

| Values | Alternatives | |
|---|---|---|
| | Three | Five |
| Natural Beauty of the Shorelines | 3 | 2 |
| Water Travel Network | 3 | 2 |
| Vegetation | 2 | 1 |
| Wildlife | 2 | 1 |
| Recreation Experience | 3 | 3 |
| Research Opportunity | 2 | 3 |
| Total | 15 | 12 |

Looking first at "Water Travel Network" there is no indication from the preceding discussion [18] that there is any difference between the policies of Alternatives 3 and 5. Yet, Alternative 3 is given a "best" (3) rating while Alternative 5 is given an "average" (2) rating.

Next, looking at "vegetation" the Forest Service has in effect concluded that cutting the Portal Zone is better for vegetation than is management by leaving it uncut or allowing fire where possible. It has been the Forest Service's position throughout the 1974 trial that logging timber is at least better for the forest than leaving it uncut or unburned as the Forest Service intends to do in the Interior Zone. Even assuming that the Forest Service is correct, in the assessment of the effects of logging versus no logging on vegetation management, and this court does not think that it is, it is apparent that no part of the category of "vegetation" value as defined here, is in any way concerned with preserving virgin timber. If it were, then Alternative 5, which will reserve the entire Interior Zone and virgin timber in the Portal Zone, from commercial timber harvest, should most certainly be rated as more responsive to "vegetation" value than Alternative 3.

It therefore appears that the Forest Service does not consider "virgin timber" to be a value which should be considered, much less preserved.

It is apparent that in formulating this chart, no consideration was given to the value of virgin timber. Nor is there any indication how these six values re-

---

18. *"Water Travel Network* [Discussion]

The characteristic that separates the BWCA from other units of the National Wilderness System is the visitors dependency on water travel and the interconnecting portages. These routes must be safe, negotiable, and identifiable. All alternatives provide for portages where needed. Alternatives 3 and 5 add a new dimension, a primitive trail system for land travel to areas that heretofore have had little or no use. The long-term gain is better visitor distribution and more opportunities for primitive recreation experience.

Protection of historic water levels requires maintenance, repair, and replacement of existing dams. Alternatives 1 through 5 call for water-level management; Alternative 6 does not.

Use of the travel network safely and without mishap requires informational programs. Water-hazard signing, safe portage landings, and portage signs are called for in all the Alternatives." (EIS at 110).

late to preserving the primitive character of the BWCA.

This section reaches an arbitrary, unexplained and irrational conclusion. The numerical values are arbitrarily assigned to the six values under each alternative without explanation and the values themselves do not consider the value of virgin timber.

The next section of the EIS concerned with the evaluation of alternatives is titled "Irreversible Commitments and Irretrievable Losses of Resources". (EIS at 114). This is basically a one page discussion of irreversible actions which would lead to irretrievable commitments of resources. It concludes that the risks of irretrievable commitments are greater under Alternatives 6, 5 and 1 than under Alternatives 2, 3 and 4. Part of the conclusion of this section is that Alternative 5, which would preserve all of the forest in the Interior Zone as well as virgin forest in the Portal Zone, amounts to a greater irretrievable commitment of resources than Alternative 3 which would preserve only the virgin timber in the Interior Zone. The rationale seems to be that permitting natural processes a "free reign" without controlled change will result in an irretrievable loss of most of the *values* of the BWCA. There is no explanation of what these *values* are.[19]

It is particularly odd that Alternative 4 which would preserve all of the virgin timber in the BWCA and cut all non-virgin timber, and therefore disrupt much of the recreational use that goes on in the previously logged areas, should be evaluated as having a lesser propensity for causing irretrievable loss of "most of the values of the BWCA" than Alternative 5 which will preserve all virgin timber plus protect existing recreational uses in the Interior Zone.

In reaching its conclusion that the risks of loss are greater under Alternatives 6, 5 and 1 than under Alternatives 2, 3 and 4, this section gives no value to the irreversible and irretrievable loss of virgin timber. This Court concludes that this section reaches an arbitrary, unexplained and irrational conclusion.

Furthermore, there is no explanation of the inconsistency between this section's conclusion that Alternatives 5 and 6 are the worst for preserving the primitive character of the BWCA as provided for in the special BWCA provision, and the conclusion in other parts of the EIS that Alternatives 5 and 6 put the greatest emphasis on preserving primitive conditions. (EIS at 91, 94, 113). See discussion *supra* at 1300 and *infra* at 1323–1333.

Next is the section titled "National Interests and Goals" (EIS at 115–117). This section is primarily a numerical evaluation of how well each alternative responds to each of the policies of NEPA § 101(b), quoted *supra* at 1297, the special BWCA provision policy (somewhat modified[20]) of preserving the primitive character of the area, and finally, to managing the BWCA according to applicable statutes and treaties.[21] Values are assigned in terms of best (3), average (2) and least (1) responsive to each policy. The conclusion is that Alternative 3 is superior. There is no explanation of how these numbers were assigned. It appears to be the typical practice of the Forest Service throughout the EIS to either leave the important conclusions unexplained as in the Matrices or else arbitrarily assign numbers without explanation and then use them to reach the desired conclusion.

19. Possibly these values are the six values outlined in the section on the "Relationship Between Short-Term Uses and Long-Term Productivity for Each Alternative", discussed *supra* at 1320.

20. The language actually used differs from the special BWCA provision language (see *supra* at 1298–1299). It reads as follows: "Preserve and perpetuate the primitive char-

acter of the area, particularly the lands with unique water-related characteristics in the vicinity of lakes, streams, portages, and trails." (EIS at 117).

21. The language used reads as follows: "To the fullest extent possible, administer the area in accordance with the statutes and treaties now governing the management and administration of the BWCA." *Id.*

This section is inadequate because it does not explain its conclusions.

One particularly arbitrary conclusion is that Alternative 3 is rated as best (3) for preserving the primitive character of the area while Alternative 5 which would preserve the Interior Zone and all the virgin forest in the Portal Zone is rated as worst (1). Also rated worst (1) is Alternative 6 which would prohibit all timber harvesting. Again, as in the last section, Alternative 4 which would preserve all of the virgin timber but disrupt recreational use in the Portal Zone, is evaluated as average (2), therefore, superior to Alternative 5, for preserving the primitive character of the area. There is no explanation for this seemingly irrational conclusion.

The EIS has supposedly evaluated all of the alternative packages completely, yet it does not contain any type of reasonable discussion as to why Alternative 3 is superior to any other management alternative.

*Conclusion*:

It is not possible for a reader of the EIS or this Court to understand why or how the Forest Service arrived at the conclusion that Alternative Package 3 was superior to any of the other management packages. Likewise, it is impossible to determine how the vegetation management policy of logging in the Portal Zone but not in the Interior Zone was evaluated and determined to be the superior management policy. The Section of the EIS on Alternatives (EIS at 79–117) is for the most part a collection of subsections either without conclusions, or with unexplained and often illogical conclusions, which in turn are used to arrive at the final unexplained conclusion that Alternative 3 is the superior management policy.

The process by which the Forest Service evaluated these packages of alternatives is inadequate under NEPA § 102(2)(C)(iii) & (D). It does not provide the basis for a reasoned decision to use logging as a vegetation management tool in the Portal Zone but not the Interior Zone as provided for in Alternative

3. The EIS suggests, in fact, that Alternatives 5 or 6 are superior to Alternative 3 in terms of preserving the primitive character of the area. (EIS at 91, 94, 113). See discussion, *supra* at 1300–1301 & 1322–1323 and *infra* at 1332–1333.

Furthermore, the EIS evaluation of alternatives reached an unexplained conclusion and therefore cannot serve as a basis for consideration of environmental factors by the agency involved and cannot provide a basis for critical evaluation by those not associated with the agency as required by NEPA. *Iowa Citizens v. Volpe,* 487 F.2d at 851; *E. D. F. v. Froehlke,* 473 F.2d at 351.

**D. *General Conclusion as to the Inadequacies of EIS***

As discussed *supra,* at 1298–1299, in reviewing the Forest Service's decision to log in the virgin forest areas of the BWCA this Court must first determine if the Forest Service reached its decision after a full, good faith consideration and balancing of environmental factors. The Court must then determine, according to the standards set forth in NEPA § 101(b) and 102(1) whether the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. *E. D. F. v. Corps,* 470 F.2d at 300.

This Court has discussed at length the various failures of the EIS to comply with the provisions of NEPA § 102(2)(C) & (D). Based upon those failures this Court concludes that the Forest Service has failed to reach its decision after a full, good faith consideration and balancing of environmental factors and that therefore the Forest Service's EIS is inadequate under NEPA.

Furthermore, considering the actual balance of costs and benefits struck, the Court finds that the Forest Service's decision is arbitrary and clearly gives insufficient weight to environmental values, applying the standards of NEPA § 101 and 102(1). (quoted *supra* at 1296–1297.)

Section 102(1) directs that to the fullest extent possible, the policies, regula-

tions and public laws of the United States be interpreted in accordance with the policies of NEPA. Section 101(b) sets out the specific policies to be implemented. Those policies are repeated here for emphasis and ease of discussion. They are as follows:

1. fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

2. assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

3. attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

4. preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

5. achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

6. enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources. NEPA § 101(b).

This Court has already discussed, *supra*, at 1304–1307, the failure of the EIS to implement the policy of "fulfilling the responsibilities of each generation as trustee of the environment for succeeding generations" as part of the discussion of the failure of the EIS to consider how adverse impacts of a logging policy could be minimized in the short run life of the EIS and Management Plan in violation of NEPA § 102(2)(C)(i) & (ii). That policy and the remaining five policies of NEPA § 101(b) are in general aimed at prohibiting unnecessary degradation of our environment while recognizing that the environment must in some cases be altered to accommodate the needs of human civilization. In attempting to attain the widest range of beneficial uses of the environment, it

must be kept in mind that the purpose of Forest Service management of the BWCA, as provided for by Congress, is to provide and preserve a primitive environment for public use and enjoyment. To destroy the primitive character it had at its creation is to forever deprive the public of this environment.

This Court concludes that the Forest Service's decision to log in the Portal Zone is arbitrary and is clearly based on giving insufficient weight to environmental values because that decision threatens unnecessary degradation of our environment contrary to the policies of NEPA § 101(b) and 102(1).

First, the very fact that the EIS was prepared in a manner which does not amount to a full, good faith balancing of environmental values makes the decision to log virgin timber a decision which was reached without a full understanding of its environmental impacts. The purpose of NEPA is to see that the agency understand the implications of its proposed action; a decision to conduct logging operations in the Portal Zone without an adequate EIS is itself arbitrary under NEPA.

Second, the decision to log in the Portal Zone but not in the Interior Zone in the name of vegetation management is arbitrary because it is not based upon there being any distinction between the composition of forests in the Portal Zone and those in the Interior Zone. (Transcript 2021–2022). There is no logical reason for using a different management tool for one zone and not the other, aside from the production of commercial timber, which the Forest Service denies is its intention. (Management Plan at P–16). (Transcript 1368).

Thirdly, the decision to log in the Portal Zone is based upon the unsound assumption that there is sufficient virgin forest in the BWCA to accommodate logging as well as satisfy increasing demands for areas for recreational, scientific, and educational use. As discussed, *supra* at 1312–1314, damage to the primitive character of the BWCA is already occurring from overuse in some areas,

yet the EIS does not contain any statistical or other projection as to future increases in user demands. The EIS merely discusses past increases and concludes the obvious, that user demands will continue to increase.

This Court finds that it is arbitrary to assume that research, recreational and educational use of the BWCA is compatible with logging particularly in the face of plans to restrict research and recreation and the fact that these activities are causing environmental damage even at present use levels.

Fourthly, the decision to log in the Portal Zone is based upon the yet uncertain assumption that mining can be halted in the BWCA, particularly copper-nickel mining in the Duluth Gabbro formation. There are existing private mineral rights in the BWCA which if mined could result in a bisection of the largest block of virgin forest in the BWCA. This would have a very detrimental effect upon the amount of virgin forest in the BWCA, especially large blocks of virgin forest.

Fifth, logging in the contiguous virgin forest area of the BWCA destroys the primitive character of the area as defined in the special BWCA provision of the Wilderness Act. 16 U.S.C. § 1133(d)(5).

## VII. THE WILDERNESS ACT

### A. The Special BWCA Provision

The second question which confronts this Court is the extent to which the special BWCA provision of the Wilderness Act, 16 U.S.C. § 1133(d)(5), precludes logging in the virgin forest areas of the BWCA.

Specifically, this Court must determine the meaning of the special BWCA provision language:

> Other provisions of this chapter to the contrary notwithstanding, the management of the Boundary Waters Canoe Area, . . . shall be in accordance with regulations established by the Secretary of Agriculture in accordance with the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, the primitive character of the area, particularly in the vicinity of lakes, streams and portages.

16 U.S.C. § 1133(d)(5).

This Court is particularly concerned with the meaning of the words "primitive character" and in defining those restrictions on timber harvesting, and its related activities, which are *necessary* in order to maintain "the primitive character of the area."

### B. Statutory History of the BWCA

This Court's 1973 Opinion discusses the Statutory History of the BWCA. Portions of that history which are helpful in understanding the special BWCA provision and those restrictions on logging which are *necessary* in order to preserve the primitive character of the area, are quoted here at length, as follows:

#### Statutory History

In 1909 pursuant to the Forest Reserve Act of 1891, 16 U.S.C. § 471, 1,159,700 acres of land in Northern Minnesota was designated as a Presidential Proclamation as the Superior National Forest. Congress set forth the basic management directives for maintaining the National Forests in the Organic Act of June 4, 1897, 16 U.S.C. §§ 475, 476, which provided that:

> No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States
>
> . . . . .
>
> In recognition of the importance of maintaining this area in a primitive state a large portion of the Superior National Forest was designated as the Superior Primitive Area by the Secretary of Agriculture in 1926, under regulations promulgated by the Secretary, no permanent roads were to be

constructed and severe restrictions were placed on commercial logging. In 1930, Congress passed the Shipstead-Newton-Nolan Act, 16 U.S.C. § 577, to conserve the natural beauty of shorelines of lakes and streams for recreational use. In order to carry out this purpose it was provided that:

> The principle of conserving the natural beauty of shore lines, for recreational use shall apply to all Federal lands which border upon any boundary lake or stream contiguous to this area, or any other lake or stream within this area which is now *or eventually to be* in general use for boat or canoe travel, and that for the purpose of carrying out this principle logging of all such shores to a depth of four hundred feet from the natural water line is forbidden, except as the Forest Service of the Department of Agriculture may see fit in particular instances to vary the distance for practical reasons: Provided, that in no case shall logging of any timber other than diseased, insect infected, dying or dead be permitted closer to the natural shoreline than two hundred feet, except where necessary to open areas for banking grounds, landings and other uses connected with logging operations. 16 U.S.C. § 577a.

In 1939 much of the Superior Primitive Area, plus additional areas acquired by expansion of the Forest in 1936, were classified as the Superior, Caribou, and Little Indian Sioux Roadless Areas, pursuant to regulations of the Secretary of Agriculture. The policy of prohibiting permanent roads and of restricting commercial logging in accordance with the Shipstead-Newton-Nolan Act was continued. In 1941, the Secretary set up a special zone consisting of about 362,000 acres, lying just to the south of the Canadian border, in which commercial logging was prohibited.

With the advent of a new management plan in 1948, the Superior Road-less Areas were reclassified under Secretary of Agriculture regulation U-3, which provided that:

> Lands which qualify in general as wilderness except that certain economic values are dominant with recreation value, may be classified as roadless areas * * *. *The management objective will be to preserve as much of the wilderness value as possible* and still permit use of timber and other industrial uses. Only temporary roads will be permitted in roadless areas. Resource uses will be managed to preserve all possible wilderness values.

The 1948 Management Plan for administration of the Roadless Areas was similar to that established in 1939 but greater restrictions on commercial activities and vehicle use were imposed. With only minor modifications, management of the Superior Roadless Areas was conducted under the guidelines of the 1948 Management Plan until the passage of the Wilderness Act in 1964 and the promulgation of the rules thereunder in 1965.

In passing the Wilderness Act, Congress attempted to insure that certain primitive and natural areas, such as the BWCA, were classified as wilderness areas and that these areas would be preserved for the benefit of future generations. The Congressional declaration of policy is set forth in 16 U.S.C. § 1131(a):

> In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness. For this purpose there is hereby established a National Wil-

derness Preservation System to be composed of federally owned areas designated by Congress as "wilderness areas", and these shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, *the preservation of their wilderness character,* and for the gathering and dissemination of information regarding their use and enjoyment as wilderness; and no Federal lands shall be designated as "wilderness areas" except as provided for in this chapter or by a subsequent Act.

Wilderness is defined as follows: A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of *wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence,* without permanent improvements or human habitation, *which is protected and managed so as to preserve its natural conditions and which* (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; *(2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation;* (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and *(4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.* 16 U.S.C. § 1131(c).

Other sections of the Wilderness Act set out the responsibility of the federal agency administering a Wilderness area:

> Except as otherwise provided in this chapter, *each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character. Except as otherwise provided in this chapter, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use.* 16 U.S.C. § 1133(b).

and the uses which are generally prohibited in such areas:

> *Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness* area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area. 16 U.S.C. § 1133(c). 358 F.Supp. at 589–591. (Emphasis added) (Footnote omitted).

During the time that Congress was considering the Wilderness Act, Secretary of Agriculture Orville F. Freeman appointed a committee, known as the Selke Committee, to review the management of the BWCA, and specifically, to study the issue of whether or not logging should be continued. The Committee recommended the continuation of timber harvesting of overaged timber outside the no-cut zone in a manner

which would return the forest to a balanced age classification and the use of logging methods compatible with the management of a primitive type recreation area. 1973 Opinion, 358 F.Supp. at 592.

In its final report, the Selke Committee adopted as its main objective for vegetation management, "to obtain a forest of the long-lived species, such as the Red Pine, White Pine and White Spruce". (Defendants Exhibit 153 at 2). In reaching its conclusion, the Committee relied heavily on the testimony of Dr. Frank H. Kaufert, Director of the School of Forestry at the University of Minnesota. Dr. Kaufert, testified before the Committee, that the present forests are primarily short-lived species (60 to 90 years) such as Balsam Fir, Aspen, Jack Pine and Black Spruce in large areas, and that the longer-lived Norway and White Pine, which he considered more esthetically desirable, are very limited. (Defendants Exhibit 150–D at 21).

Secretary of Agriculture Freeman generally agreed with the committee's recommendations regarding the management of the BWCA as a primitive type recreation area. *Id.*

Pursuant to the Wilderness Act the Secretary of Agriculture promulgated regulations governing the management of the BWCA on December 21, 1965. These regulations, as slightly amended, are contained in 36 C.F.R. § 293.16.

C. *The Purpose Of The Special BWCA Provision*

■ The special BWCA provision of the Wilderness Act was necessary to afford the BWCA the same protection as other wilderness areas although the area did not conform with the statute's proposed definition of wilderness. Past timber harvesting disqualified the BWCA as a wilderness under the proposed definition and rather than dilute that definition, the special BWCA provision was written to include the BWCA within the protection of the Wilderness Act.

In an appearance before the Senate Interior and Insular Affairs Committee on June 19, 1957, Dr. Richard E. McArdle, Chief of the Forest Service, speaking on behalf of the Department of Agriculture, stated the objections of the Department to *S. 1176* as written and offered a substitute bill which contained language very similar to the special BWCA provision.

Dr. McArdle explained the purpose of the provision on the BWCA as follows:

Mr. McArdle. My General Counsel may want to correct me on this, Senator Barrett. *But I think the reason that we are putting that in ties to the next item, item 8, the Superior areas in Minnesota.* Those were established on land where some logging was going on back from the water courses, and it has been continued up there. I think the ordinary canoeist going along would never know that any commercial use is going on back from the water courses. *We wanted very much and the wilderness people wanted very much, to have this particular area, these three roadless areas—when I say 'roadless' I mean permanent roads —in Minnesota included in the wilderness area and managed as wilderness. And we want to do it, too, but since there are temporary logging roads in there which are plowed up and blocked after logging, we could not include those in the other definition. We would be precluded from having them managed as wilderness under the proposed legislation, unless you took special action. And that is why those areas are mentioned. And these roads are purely temporary. They are not permanent roads.*

(*Hearings on S. 1176 Before the Senate Committee on Interior and Insular Affairs*, 85th Cong., 1st Sess., at 100 (June 19, 1957) (Defendants Exhibit 123). (Emphasis added).

In effect, Dr. McArdle was saying that since temporary logging roads were present in portions of the BWCA (then

known as the Superior Roadless Areas) that the entire block would not fit the definition of wilderness. Nonetheless, he indicated the Forest Service's desire to manage the areas as wilderness.

On June 18, 1958, Senator Humphrey introduced *S. 4028* which included the revisions insisted upon by the Department of Agriculture as submitted by Dr. McArdle in June of 1957. 104 Cong. Rec. 11551 (1958) (Defendants Exhibit 131).

In a letter to Senator Humphrey dated July 7, 1960, Dr. McArdle noted that the management policies in force for the area were designed to protect its unique wilderness character:

It has been our objective to manage the Boundary Waters Canoe Area so that its unique *wilderness character* might be protected. (Defendants Exhibit 137).

A policy statement approved by Secretary of Agriculture Freeman on April 27, 1961 and presented to Congress states:

National-forest Wilderness and Wild areas and the Boundary Waters Canoe Area are integral parts of the National-Forest Wilderness System. They have been established after careful study and a determination that they are predominantly valuable for wilderness. This determination was made with the full realization that *these areas included some valuable resources other than wilderness, which must be foregone so that the wilderness resource may be managed and protected.* It was also made in recognition of the fact that wilderness is a relatively scarce resource and that an appropriate amount of it must be preserved in the national forests for the enjoyment of present and future generations . . . . *This Department will not look with favor on any attempts to invade established Wilderness and Wild areas or the Boundary Waters Canoe Area, unless there is overwhelming evidence that the general public interest requires it and that the gain surely*

*overbalances the loss of wilderness.* (Plaintiffs Exhibit 22 at 7). (Emphasis added).

Thus, the Secretary of Agriculture, during the pendency of the Wilderness Act, stated a strong policy to prevent "any attempts to invade . . . the Boundary Waters Canoe Area." *Id.*

 Against this background, it is clear that the main purpose for including the special BWCA provision in the Wilderness Act was not to simply allow timber harvesting in the BWCA, but rather to allow the entire BWCA to be designated as a wilderness area despite the fact that some timber harvesting was going on in parts of the area; by the special BWCA provision, Congress sought to preserve the wilderness character of the area.

D. *Preserving The "Primitive Character" Of The BWCA*

In interpreting the meaning of the special BWCA provision at the 1974 trial, the Defendants strongly stressed the fact that the provision directs that the "primitive" rather than the "wilderness" character of the BWCA be preserved. They suggest that a logged over area can retain its "primitive character" even if it cannot retain its "wilderness character". This Court finds this distinction to be without merit.

First, the term wilderness, as used in the Wilderness Act has a technical meaning. It designates the federally owned lands set aside by Congress for special treatment under that Act. The Act provides that ". . . no Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter or by a subsequent act." 16 U. S.C. § 1131(a). Therefore, Congress specifically avoided the term "wilderness character" in describing a feature or quality of the area in order to prevent confusion with its statutory definition of "wilderness area", discussed *supra* at 1327–1328.

The word "primeval" (a synonym for primitive) appears in the Wilderness Act describing one of the qualities which an

area must have to qualify for wilderness status. The Act defines wilderness in part as ". . . an area of undeveloped Federal land retaining its *primeval* character and influence . . . ." 16 U.S.C. § 1131(c) (quoted *supra* at 1327) (emphasis added).

The use of the word "primitive" as designating a quality possessed by a wilderness area, is evident in a letter by Assistant Secretary of Agriculture E. L. Peterson recommending approval of a change in the area's name from the "Superior Roadless Areas" to the "Boundary Waters Canoe Area". In that letter he noted that the word "wilderness" was consciously excluded from the name of the area:

> The word 'wilderness' was not used in the name because it has a technical connotation in connection with Regulation U–1 and this area is not a wilderness in that sense, even though it is very *primitive* in places. (Plaintiffs Exhibit 221). (Emphasis added).

██ Additionally, dictionary definitions of wilderness (wild) and primitive bear out the similarity of the two words. The dictionary definitions are also consistent with the definition of "wilderness" in the Wilderness Act itself. These definitions all contain the notion of an absence of human influence. In the Wilderness Act this notion is expressed in the opening sentence of the definition:

> A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. 16 U.S. C. § 1131(c).

Therefore, the term "wilderness", as used by Congress, is a technical term which serves to classify areas containing primitive characteristics. When used as an adjective to describe characteristics of an area, its meaning is the same as "primitive", and is often used interchangeably with it. Since the terms are synonymous, restrictions set out in the Wilderness Act designed to preserve the "wilderness" character of areas should govern the interpretation of "primitive" character as used in the special BWCA provision.

The Wilderness Act prohibits commercial enterprise, permanent and temporary roads, the use of Motor Vehicles and equipment, and any structures within wilderness areas, because these tend to destroy the wilderness (i. e. primitive) character of an area. 16 U.S.C. § 1133(c). Additionally, the Secretary of Agriculture's Regulations promulgated pursuant to the Wilderness Act expressly prohibit "cutting of trees for non-wilderness purposes" as part of a policy for managing wilderness area. 36 C.F. R. § 293.6. The Regulations further state one of the policy's objectives is the maintenance of *primitive* conditions. 36 C.F.R. § 293.2(b).

Thus, both the Wilderness Act and the Secretary's Regulations suggest the adverse effects that logging has on the primitive character of an area. This is consistent with this Court's conclusion in the 1973 opinion that logging tends to destroy the primitive character of an area consisting of virgin forest. 358 F. Supp. at 617.

██ The private Defendants suggest that the fact that the special BWCA provision specifies the preservation of the primitive character of areas *"particularly* in the vicinity of lakes, streams and portages" indicates that less protection is to be afforded areas not in the vicinity of lakes, streams and portages. This contention is rejected by this Court.

First, the BWCA is by name an area used for canoe travel. Congress, in enacting the special BWCA provision, was mindful of the fact that the area's recreational use at that time consisted primarily of canoeing along the lakes and streams. Therefore, it is reasonable that Congress should emphasize the preservation of the primitive character of these particular areas. Such emphasis does not in any way detract from the

statutory mandate of preserving the primitive character of the BWCA as a whole.

Secondly, the special emphasis on lakes, streams and portages is consistent with the provision of the Shipstead-Newton-Nolan Act (16 U.S.C. § 577) designed to conserve the natural beauty of shorelines of lakes and streams for recreational use. That Act prohibits logging of all shores to a depth of 400 feet from the natural water line. The special emphasis in the Wilderness Act on preserving the lakes and streams of the BWCA is significant as an indication that the purposes of the Wilderness Act are to be consistent with, and are to include those, of the Shipstead-Newton-Nolan Act. The Wilderness Act provides that "Nothing in this chapter shall modify the restrictions and provisions of the Shipstead-Nolan Act. . . ." 16 U.S.C. § 1133(a)(2).

Thirdly, the very language of the special BWCA provision is significant; the word of special emphasis is "particularly". This word is used to focus attention upon the greatest use of the BWCA, (i. e. for canoe travel), it is not a word of limitation or qualification. It does not qualify the general statement that the primitive character of the BWCA is to be preserved. Had Congress wished to preserve the primitive character of the area *only* in the vicinity of lakes, streams and portages, the provision would simply read that the primitive character of the BWCA was to be preserved "in the vicinity of lakes, streams and portages".

E. *Restrictions On Timber Harvesting Which Are "Necessary" To Maintain The Primitive Character Of The BWCA*

The fundamental purpose of management of the BWCA is to maintain its primitive character. The Forest Service claims to recognize this in the EIS and Management Plan by stating a policy toward vegetation management which states that the area will be managed to preserve its primitive character (Management Plan at P–15) and not to produce a sustained yield of commercial timber (Management Plan at P–16).

This Court has discussed *supra* at 1299–1302, how the Forest Service's policy of vegetation management is not directed towards "preserving the primitive character of the BWCA". Essentially, the Forest Service's policy is to produce a man-planned result and not to replicate nature. The EIS and Management Plan provide that the vegetation management policy of the Forest Service is "aimed at perpetuating a variety of successional stages and a diversity of vegetation communities . . .". (EIS at 5, Management Plan at P–15).

Managing the BWCA for the purpose of producing commercial timber, or to produce any type of forest other than a natural one, is contrary to the purposes of the Wilderness Act and the special BWCA provision. The Forest Service vegetation management policy is in effect an attempt to improve upon nature.

Nowhere in the legislative history of the Wilderness Act is there any indication that Congress intended that logging or any other management tool be used to produce the type of forest in the BWCA desired by the Forest Service. Nature may not always be as beautiful as a garden but producing gardens is not the aim of the Wilderness Act.

When there is a conflict between maintaining the primitive character of the area and between any other use (including that of timber) the general policy of maintaining the primitive character of the area must be supreme. This is suggested by the very language of the special BWCA provision, 16 U.S. C. § 1133(d)(5), and by the late Judge Phillip Neville in *Izaak Walton League of America v. St. Clair, supra*, 353 F. Supp. at 714, see discussion *supra* at 1315.

The plain meaning of the special BWCA provision is that the Secretary of Agriculture will restrict timber harvesting and other activities to the extent that they interfere with maintaining the BWCA in a primitive condition. 16 U.S.C. § 1133(d)(5).

The dominance of primitive or wilderness preservation over other uses is also reflected in the Secretary's Regulations governing the management of the BWCA and other wilderness areas. Commercial timber cutting is prohibited in both primitive (36 C.F.R. § 293.17) and wilderness areas (36 C.F.R. § 293.6) except in the BWCA to the extent authorized by the Wilderness Act. 36 C.F.R. § 293.16. Regulations provide that "wilderness" will be made available for human use to the optimum extent consistent with the maintenance of primitive conditions (36 C.F.R. § 293.2(b)) *and in cases of conflict wilderness values shall dominate.* 36 C.F.R. § 293.2(c).

Therefore, a restriction upon timber harvesting is "necessary" within the meaning of the Wilderness Act whenever timber harvesting interferes with the maintenance of the primitive character of the BWCA.

As discussed *supra* at 1307, this Court in its 1973 Opinion discussed the effects of logging upon the primitive character of the BWCA. 358 F.Supp. at 609–617. After hearing and considering all of the evidence at the 1973 trial, this Court concluded that, "Once an area has been logged it cannot be fully returned to its natural state although if proper methods of reforestation are used, that result can be approximated to the untrained eye." 358 F.Supp. at 610.

After discussing the various logging and reforestation methods and their effects on the BWCA, this Court concluded that logging destroys the primitive character of the area logged. 358 F.Supp. at 617. The evidence at the 1974 trial has served to reinforce the findings and conclusions of the 1973 trial, discussed above, concerning the effects of logging upon the primitive character of the BWCA. Based upon the combined testimony and exhibits of the 1973 and 1974 trials, this Court concludes that logging in virgin forest areas destroys the primitive character of the area logged.

The question then is what restrictions upon logging in the BWCA are "necessary" to preserve the primitive character of the area. It is obvious that the special BWCA provision contemplates that some logging will occur within the BWCA. However, at the time that the Wilderness Act was passed, Congress was not aware (nor was anyone) of the exact location and extent of the virgin forest areas of the BWCA. While about half of the area in the Portal Zone has been previously logged, (218,000 acres of 418,000 total acres [22]), there are substantial blocks of virgin timber which remain in that zone. (EIS at 101–102). The virgin forest areas of the Portal Zone are more primitive than non-virgin forest areas and for that reason the maintenance of the primitive character of those areas requires a more protective management policy than is required in those areas whose primitive condition has already been compromised by past logging. Once an area has been logged, as we have discussed *supra* at 1307–1308 it can never be fully returned to its natural state although this result may be approximated by proper reforestation techniques. This Court must therefore conclude that logging within previously logged over areas does not have as much of an adverse effect on the primitive character of the area as does logging in virgin forest areas. Furthermore, in terms of wilderness value, blocks of contiguous virgin forest are of greater value than are isolated patches of virgin area. (See discussion *supra* at 1316).

The Forest Service has chosen a policy alternative for managing the BWCA which by its own estimates will not preserve the primitive condition of the BWCA to as great an extent as would other alternatives. The EIS acknowledges that Management Alternatives 5 and 6, which would halt all cutting of virgin forest, put the greatest emphasis on preserving the primitive character of the BWCA. (EIS at 91, 94, and 113, *see* discussion *supra* at 1300–1323).

22. See text and note, *supra* at note 5.

The special BWCA provision of the Wilderness Act does not provide for "compromising" the primitive character of the BWCA, it provides for "preserving" it.

This Court must conclude that preserving the large blocks of virgin forest in the Portal Zone is essential to the preservation of the primitive character of the Portal Zone area and the BWCA as a whole. Therefore this Court concludes that the Wilderness Act prohibits logging in those areas of the BWCA whether in the Interior or Portal Zones, which are contiguous to remaining large blocks of virgin forest.[23] This includes the area of the six existing sales currently under this Court's injunction.

Furthermore, this Court concludes that the Secretary of Agriculture's regulation, 36 C.F.R. § 293.16, is invalid to the extent that it permits logging in the remaining large blocks of virgin forest areas of the BWCA.

## VIII. COUNTERCLAIM FOR DECLARATORY RELIEF

For the reasons discussed above, the counterclaim of defendant Consolidated Papers, Inc. for a declaratory judgment that the EIS and Management Plan are consistent with the Wilderness Act and that a total proscription on logging in the Portal Zone would be unlawful both under the Wilderness Act and other applicable laws and regulations, is hereby denied.

This Court is not faced with a management plan which would halt all logging in the BWCA; however, this Court believes that prohibiting all logging in the BWCA is consistent with the special BWCA provision of the Wilderness Act because logging in any form, even in previously logged areas, has a disruptive effect upon the primitive character of the area. This disruptive effect is sufficient to justify eliminating all BWCA logging at the discretion of the Secretary of Agriculture. 16 U.S.C. § 1133(d)(5).

## IX. INJUNCTION

This Court finds that the plaintiffs are entitled to an injunction against logging in those areas of the BWCA which are contiguous with the remaining large blocks of virgin forest, on two separate grounds.

First, the EIS prepared by the Forest Service is inadequate under NEPA and the plaintiffs are entitled to a permanent injunction against the defendants logging or allowing logging pending the Forest Service's filing of an impact statement which complies with NEPA and this decision.

Second, the Wilderness Act prohibits logging in those areas which are contiguous to the remaining large blocks of virgin forest area in the BWCA, and plaintiffs are entitled to a permanent injunction against defendants logging or allowing logging in those areas.

The injunction under the Wilderness Act, being more permanent, as a practical matter overshadows the NEPA injunction.

Concerning the existing timber sales, this Court's preliminary injunction of September 18, 1974, as amended January 22, 1975, will be continued in force as a permanent injunction.

The necessity of a permanent injunction under the Wilderness Act makes it unnecessary for this Court to balance the equities in deciding whether or not an injunction should be issued under NEPA, pending the Forest Service's completion and filing of an EIS which complies with NEPA and this decision. 358 F.Supp. at 625. However, even if a

---

23. The remaining large blocks of virgin forest within the BWCA roughly include, the area extending from western Lac La Croix to eastern Crooked Lake, the area from Gabbro Lake to Saganaga Lake, the northern portion of the "Little Indian Sioux" unit (that portion of the BWCA south on the Echo Trail) and most of the "Caribou" unit (that portion of the BWCA east of the Gunflint Trail). Each of these remaining large blocks of virgin forest, standing alone, is of sufficient size to meet the definition of a wilderness as set forth in the Wilderness Act, 16 U.S.C. § 1131(c)(3), being in excess of 5,000 acres.

balancing were necessary, this Court finds that an injunction should be issued. The evidence has shown that the loss of virgin forest would have a very significant adverse impact upon the primitive character of the BWCA and would cause immediate and irrepairable harm to the plaintiffs and to the public interest. The language of the Court of Appeals in *Butz*, discussing the propriety of an injunction pending the preparation of *this* EIS, is equally applicable to an injunction pending the preparation of a *second*, and hopefully adequate, EIS. That language reads as follows: "If the cutting were allowed to continue pending preparation of the EIS regarding the effects of logging, the District Court would have been engaging in an exercise in futility, because any damage that might have been avoided after study would have irreversibly occurred." 498 F.2d at 1323.

Additional equities weigh heavily in favor of granting this injunction. First, the Forest Service made its decision without an adequate consideration of the impacts of the proposed action as required by NEPA. Second, the decision to log in the virgin forest area of the Portal Zone is arbitrary and clearly gives insufficient weight to environmental values in violation of NEPA. Thirdly, if logging is to be used as a management tool then it can be conducted in a manner which will have a much less adverse impact upon the forests of the BWCA than logging as it is now contemplated. This Court is convinced that

an adequate EIS would show that logging destroys the primitive character of the BWCA and that it should not be used as a management tool.[24]

While it appears that there would be some harm to the private defendants from the loss of virgin forest as a source of forest products pending the completion and filing of an adequate EIS, no urgent need for production has been shown. These defendants can satisfy most of their needs from alternative sources of supply. In fact, the evidence showed that the defendants can obtain adequate sources of timber even if the BWCA were to be permanently closed to *all* logging operations. However, as mentioned *supra*, the Wilderness Act injunction as a practical matter overshadows the NEPA injunction.

Therefore, for the reasons herein discussed,

It is ordered that:

1. The defendants are hereby permanently enjoined from engaging in or permitting others to engage in logging or logging related activities within those areas of the BWCA which are contiguous with the remaining large blocks of virgin forest in the BWCA.[25]

2. The defendants are hereby permanently enjoined from engaging in or permitting others to engage in logging or logging related activities in those portions of the existing timber sales which are the subject of this Court's preliminary injunction of September 18, 1974 as amended January 22, 1975.

24. The private defendants place much emphasis upon the language in this Court's 1973 opinion which suggests that an injunction against logging pending the preparation of this EIS might not be warranted if there was little or no chance that the Forest Service would decide to prohibit logging or to restrict it to non-virgin forest areas. 358 F.Supp. at 625. They suggest that an injunction pending the preparation of an adequate EIS should not issue since this EIS shows that the Forest Service is committed to logging. This Court can understand the defendants emphasizing this language. However, it was only intended to reflect, albeit imprecisely, this Court's feeling that it would be unfortunate if logging were to continue pending the preparation of an EIS which ultimately concluded that logging should be prohibited. At this time this Court is faced with a different situation. This Court continues to believe that logging destroys the primitive character of the area and that an adequate EIS would require restricting it to non-virgin forest area. There are also additional problems which must be worked out in the EIS including the compatibility of logging with mining, research, recreational and educational use of the BWCA. Additionally, logging, if it must be used could be conducted in such a manner as to minimize its adverse impacts.

25. *See* note 23, *supra* at 1333.

APPENDIX A–1

GRAND MARAIS

ELY

N
E
W
S

LEGEND

☐ INTERIOR OR "NO CUT" ZONE

▤ PORTAL ZONE

▨ ADDITIONS TO INTERIOR ZONE TO BE MADE BY DEC. 31, 1975

SCALE:
4 3 2 1 0 2

SUPERIOR *National Forest*

BOUNDARY WATERS CANOE AREA

THE INTERIOR ZONE

EXHIBIT NO.
1

KEY MAP

BOUNDARY WATERS CANOE AREA
SUPERIOR NATIONAL FOREST

planning division

APPENDIX A-2

**SUPERIOR National Forest**

BOUNDARY WATERS CANOE AREA

LOGGING HISTORY

EXHIBIT NO. 5

LEGEND

AREAS LOGGED PRIOR TO 1940

AREAS LOGGED SINCE 1940

SCALE:

KEY MAP

BOUNDARY WATERS CANOE AREA

SUPERIOR NATIONAL FOREST

Planning Division

GRAND MARAIS

ELY

N W E

APPENDIX A–3

LEGEND
• AREA OF MINERALIZATION

SOURCE:
TAKEN FROM A MAP
AT MINNESOTA GEO-
LOGICAL SURVEY
8/30/72

SCALE:

SUPERIOR *National Forest*

BOUNDARY WATERS CANOE AREA

EXHIBIT NO. 8

AREAS OF MINERALIZATION—
COPPER–NICKEL SULFIDES, OF LOW OR
MARGINAL ECONOMIC VALUES BY PRESENT STANDARDS

GRAND MARAIS

ELY

KEY MAP
BOUNDARY WATERS
CANOE AREA
SUPERIOR NATIONAL
FOREST

Planning
Division

1338

APPENDIX B

**LEGEND**

IMPACT DIAGRAM

CODE NOTATIONS
1. EFFECTS
 F=FAVORABLE
 A=ADVERSE
2. MAGNITUDE
 ▲=MAJOR
 M=MINOR
3. DURATION
 L=LONG
 S=SHORT
4. CHARACTER
 D=DIRECT
 I=INDIRECT

OTHER NOTATIONS
 N=NOT COMPATIBLE
 C=COMPATIBLE
 I=INDETERMINATE

ENVIRONMENTAL ANALYSIS
DISPLAY
Planning Division

SUPERIOR National Forest

SHEET NO. 2 OF 7

**MANAGEMENT DIRECTION**

VEGETATION

1. Management shall be in accordance with regulations...

MINERALS

MITIGATIONS

RESTRICT EXPLORATION OR EXTRACTION OF MINERALS.

LOCATE SAND & GRAVEL SOURCES TO AVOID CONFLICTS WITH OTHER USERS.

DO MANIPULATE VEGETATION

DO NOT USE HEAVY EQUIPMENT NEAR EAGLE/OSPREY NESTS

USE EXTREME CARE WITH FIRE TO AVOID DANGER TO LIFE & PROPERTY

USE HERBICIDES WITH CARE

DO NOT CLOSE EXISTING TIMBER SALES

EXTEND OR STRIP BEYOND O/Y AS NEEDED

AVOID UNNECESSARY PORTAGE CROSSING & OTHER RECREATION CONFLICTS

MINIMIZE ROAD CONSTRUCTION & DESIGN TO MINIMIZE EROSION PROBLEMS

SEASONALLY RESTRICT ACTIVITIES

(The remainder of the page consists of a large matrix chart cross-referencing Activities & Uses against Environmental Factors — Physical, Biological, Cultural, and Economic — with impact-diagram symbols and notation codes.)

## APPENDIX C
## ALTERNATIVES

In analyzing the responses received, it was evident that some people preferred to see a wide range of activities and uses permitted in the BWCA, while others favored a very limited number of activities and uses. To organize the comments for consideration, it was necessary to group them into alternative plans (1st Order Alternatives). Council on Environmental Quality Guidelines specify that an agency should consider not only alternatives that are feasible for it to implement, but also those that might be open to the Government as a whole. Two of the alternatives, one and six, go beyond the scope of Forest Service authority based on management traditions and interpretations of existing legislation. There was, however, sufficient public response on the concepts they represent to warrant consideration.

In designing the six plan alternatives for the management of the BWCA, the basic idea and the mainstay of the area's management since the early 1920's, "preserve and perpetuate the primitive character of the area, particularly in the vicinity of lakes, streams and portages" received paramount consideration. All of the alternatives discussed in the following pages, from the one that seeks to maximize benefits to the local economy to the one that looks to maximum preservation of primitive values, meet, to a degree, this prescription. Maps accompany the alternative descriptions, allowing the reader to see the zoning impacts of each.

## ALTERNATIVE 1

Alternative 1 is based on the premise that the principal value of the BWCA is the water-related primitive recreation experience it affords, but that satisfying economic (timber, services) and social (motorboats, snowmobiles) needs does not necessarily conflict with this primary use. Under this alternative there would be one land zone and two water zones. (One where motorized watercraft would be permitted and one where they would be excluded).

In protecting the land resources, prevention programs would be aimed at excluding wildfires. Maximum detention efforts would be maintained, and upon discovery of a fire, maximum suppression efforts would be employed.

Insect and disease infestations would be treated using chemical or biotic means to prevent epidemic outbreaks. Safeguards such as using only approved chemicals applied in certain locations at certain times would be adhered to.

Existing dams needed to preserve water levels would be maintained, replaced or repaired.

Permitted land or water activities and uses would be designed, contained or controlled to avoid adverse effects on air, water, soil or canoe route scenery.

Commercial logging and forest product removal would be permitted in all of the BWCA, except where prohibited by Shipstead-Newton-Nolan restrictions or in research natural areas and study areas. Some portions of the current virgin forests would be set aside as research natural areas, but most of the remaining 500,000-odd acres would be subjected to eventual logging and conversion to productive commercial forest.

The existing timber sale contracts would be continued in their original form, including original boundaries and cutting areas.

Vegetation cutting to clear areas for campsites, trails, portages, firebreaks and for wildlife habitat improvement, prescribed burning and to control insect and disease outbreaks would also be allowed.

Use of large equipment, such as tractors, would be permitted to clear and prepare the ground for reforestation.

Burning of vegetation would be permitted, but with limitations depending on identified risks.

Within certain limitations, approved herbicides would be allowed for vegetation management.

Motorized recreation vehicles (watercraft and ice and snowcraft) would be permitted on certain travel routes.

Campsites with tables, latrine and firegrate would be available on a first come basis. Travel permits would be required.

The existing motorized mechanical portages would be continued under commercial special use permits.

Only temporary roads necessary for authorized uses would be allowed.

Exploration for and extraction of minerals would be permitted to the extent authorized by law in case of national emergency.

ALTERNATIVE 2

Alternative 2 is based on maintaining two land zones in the BWCA: (1) The Interior or "No Cut Zone" containing 90% of the lake surface, would be managed in a near-natural condition; (2) the Portal Zone, a band of land along the southern boundary of the BWCA, in which the vegetation would be managed to provide forest products and multiple forest benefits. There would be two water zones to differentiate between motorized and non-motorized watercraft routes. This alternative is basically a continuation of the management practices of the past 10 years.

In protecting the land resources, prevention programs would be aimed at excluding wildfires. When a fire was discovered, suppression forces would be directed to extinguish it as soon as possible.

Insect and disease infestations would be treated using chemical or biotic means to prevent epidemic outbreaks. Safeguards, such as using only approved chemicals applied in certain locations at certain times would be adhered to.

Existing dams needed to preserve water levels would be maintained, repaired, or, if necessary, replaced.

Permitted land or water activities and uses would be designed, contained or controlled to carry out the Zone concept and to avoid adverse effect on air, water, soil, or canoe route scenery.

Commercial logging and forest product removal on temporary roads would be permitted in the Portal Zone, except where prohibited by Shipstead-Newton-Nolan restrictions or in research natural and study areas. The virgin forests of the Portal Zone would, under this alternative, be available for harvest and conversion into fully producing commercial forests. Such conversion would occur on at least the most productive sites. The existing timber sale contracts would continue in force in their original form, including boundaries and cutting areas. Vegetation cutting to clear areas for campsites, trails, portages, firebreaks and for wildlife habitat improvement, prescribed burning and to control insect and disease outbreaks would be permitted in both zones.

Use of large equipment, such as tractors, would be permitted to clear and prepare the ground for reforestation in the Portal Zone.

Burning of vegetation in both zones would be permitted but with limitations depending on risks.

Approved herbicides could be used in the Portal Zone for vegetation management.

Motorized recreation vehicles (watercraft and ice and snowcraft) would be permitted on the travel routes as identified in the Secretary's Regulations. Campsites with tables, latrines and firegrates would be available on a first come basis. Travel permits would be required.

The existing motorized mechanical portages would be continued under commercial special use permits.

Temporary roads could be constructed in the Portal Zone in conjunction with an authorized use or emergency. In the Interior Zone, temporary roads would be allowed only when a major emergency exists.

Exploration for and extraction of minerals would be permitted to the extent authorized by law in case of national emergency.

ALTERNATIVE 3 (SELECTED ALTERNATIVE)

Alternative 3 continues the present Portal-Interior Zone arrangement out-

lined under Alternative 2 but adds to this the concept of identifying and retaining remote areas within the Interior Zone. These are areas which have had no commercial logging activity, which have no motor routes, and which have few or no developed sites, in short, the areas which have the ability to provide the most primitive experiences the area has to offer. In the remote areas, vegetation management would be limited to replication, as nearly as possible, of the natural forces that caused change before the coming of white man—primarily, fire.

Under this Alternative, conflicts between motorized watercraft travelers and non-motorized watercraft travelers would be mitigated so far as possible. While the Forest Service does not have the authority to regulate use on the water surface, it does have control over what is transported over portages on Federal land. In order to provide for the needed safety on larger lakes and to minimize disturbance to those seeking primitive recreation experiences, the transport of motors over National Forest land to lakes would be subdivided into three categories:

(1) To certain International Border lakes and some large BWCA lakes —25 hp maximum per watercraft;

(2) To other waters on the present 19 routes—10 hp maximum per watercraft;

(3) To lakes and streams presently classified "nonmotor"—no motors allowed.

In protecting the land resources, prevention programs would be aimed at excluding wildfires. Prompt suppression action would be taken whenever fires were discovered. However, some early spring and late fall fires burning under conditions that do not present risks to public safety would be left unattended.

Chemicals would not be used to control native insects and diseases. They could be used under prescribed limitations to suppress outbreaks of exotic insects that could, if unchecked, develop into epidemics.

Existing dams needed to preserve water levels would be maintained, repaired, or, if necessary, replaced. Non-functional, non-hazardous, dams would be allowed to deteriorate. New dams would be permitted subject to restrictions of Shipstead-Newton-Nolan Act.

Permitted activities or uses would be designed, contained or controlled to carry out the Zone concept and to avoid adverse effects on air, soil, water and canoe route scenery.

Logging would be permitted only in the Portal Zone and outside the summer recreation season except where prohibited by Shipstead-Newton-Nolan restrictions or in research natural and study areas. Virgin areas in the Interior Zone and most of those in the Portal Zone would be reserved from harvest, but some Portal Zone virgin timber would be logged to facilitate management of the area. Existing timber sale contracts would continue in force, but provisions would be modified in accordance with the findings of environmental analyses. Vegetation could be cut in both Zones to clear areas for campsites, trails, portages, for public safety, for fire management and to aid in suppression of insects and diseases.

Large equipment such as tractors may be used to bunch slash and prepare the area for reforestation in the Portal Zone where that site has been either logged or burned.

Burning of vegetation in both zones would be permitted, but with limitations depending on risks.

Approved herbicides would be allowed for manipulation of plant composition in the Portal Zone but prohibited in the Interior Zone.

Motorized ice and snowcraft use would be permitted on current routes through the 1979–80 winter season.

Campsites with latrine and firegrate facilities would be provided in both zones. In the remote areas they would

not be provided unless sanitary or protection measures required it.

A visitor capacity and distribution plan which would identify length and location of stay would be implemented under this alternative. Travel permits would be required and the maximum party size would be limited to 10.

The existing motorized mechanical portages would be continued under commercial special use permits.

Construction of temporary roads would be allowed in the Portal Zone for authorized uses or emergencies. Temporary roads could be constructed in the Interior Zone only during emergencies.

Exploration for, and the extraction of, minerals will be limited or prohibited to the extent permitted by law where determined to be incompatible with wilderness or other environmental values.

ALTERNATIVE 4

Under Alternative 4 the two zone concept is retained but management actions are determined by man's past influences on the vegetation. The "natural" zone is characterized by large blocks of virgin forest, and the "modified zone" is made up of lands where the vegetation has been altered by man's activities, primarily logging and reforestation. Acreages of the two zones would be about equal.

There would be two water zones: motor and non-motor. In the motor zone, transport of motors across National Forest land would be allowed between the International Boundary Waters and to the periphery lakes that have auto access.

In protecting the land resources, prevention programs would be aimed at excluding wildfires. If a fire were detected, suppression forces would be directed to extinguish it. In situations where natural barriers are likely to control and where risks to public safety are minimal some in-season fires would be allowed to burn under a prescribed fire program.

Insect and disease would be controlled when a major epidemic or disaster threatens and fire or biotic control measures would be favored over chemicals.

Structures controlling water levels on large lakes would be repaired, maintained or replaced. Non-functional dams would be ignored and no new dams built.

Permitted activities or uses would be designed, contained or controlled to carry out the zone concept and to avoid adverse effects on air, soil, water and canoe route scenery.

In the natural zone, management policies would give emphasis to the individual's responsibility to care for himself by minimizing location signing and then primarily to alert visitors to safety hazards.

Logging and forest product removal would be permitted only in the area previously subjected to this treatment, except where prohibited by the Shipstead-Newton-Nolan provisions or in research natural areas or study areas. In keeping with the "theme" of this alternative, all the major blocks of virgin forest remaining in the area would receive protection. Existing timber sale contracts would be modified to exclude all major blocks of virgin forest, and other modifications would be made in accordance with the findings of environmental analyses. Vegetation could be cut in both zones (noncommercially) to clear areas for campsites, for visitor safety, trails, portages, for fire management, and to aid the suppression of insects and diseases.

Large equipment, such as tractors, would be permitted for bunching slash and preparing sites for reforestation in the logged or burned areas of the modified zone.

Prescribed burns would be permitted in the natural zone but without the aid of heavy equipment. In the modified area, these restrictions would no apply.

Herbicides would not be used to manipulate plant composition.

Motorized watercraft would be permitted on certain travel routes without horsepower restrictions. Motorized ice and snowcraft would be allowed on cer-

tain routes, but discontinued after the 1979–80 winter season.

Campsites with latrines and firegrates would be provided in both zones.

A visitor capacity and distribution plan which would identify length and location of stay would be implemented under this alternative in heavily used travel zones. Travel permits would be required and the maximum party size limited to 10.

The motorized mechanical portages between lakes along the International Boundary Waters and between car access lakes on motor routes would be continued under commercial special use permits.

Temporary roads could be constructed in the modified zone in connection with an authorized use or emergency. No roads would be constructed in the Natural Zone.

Exploration for, and the extraction of, minerals will be limited or prohibited to the extent permitted by law where determined to be incompatible with wilderness or other environmental values.

## ALTERNATIVE 5

Alternative 5 puts greater emphasis on preservation of primitive conditions and less on economics than any previous alternative. The two-zone system for land classification now in use would be retained, but the large blocks of virgin forest in the Portal Zone would be transferred to the Interior Zone. In addition, the Interior Zone remote areas identified under Alternative 3 would be expanded to include qualified areas formerly in the Portal Zone.

Under this alternative there would be two water zones—motor and non-motor. Transport of motors and motorized watercraft would be permitted across National Forest land between the International Boundary Waters and on the periphery lakes that have auto access in the motor zone. A 10 hp motor size limit would be established, mitigating some of the conflicts between motorized watercraft travelers and non-motorized watercraft travelers because of engine noise and boat speed.

In protecting the land resources, prevention programs would be aimed at excluding wildfires. If a fire were detected, personnel would be dispatched to suppress it. Some in-season fires would be allowed to burn where natural barriers are likely to control, when risks to public safety are not present and under a prescribed fire program.

Insects and diseases would be suppressed when a major epidemic or disaster threatens. Fire and biotic measures would be favored over chemicals.

Structures controlling water levels on large lakes would be maintained or replaced if their loss would affect the levels on large significant bodies of water. Non-functional dams would be ignored and no new dams built.

Where possible, prevent or control those activities that would adversely affect air, soil, water and canoe route scenery.

In the Interior Zone, management policies would place emphasis on the individual's responsibility to care for himself by minimizing location signing and then to primarily alert visitors to safety hazards.

Logging would be permitted only in the Portal Zone, except where prohibited by the Shipstead-Newton-Nolan provisions or in research natural or study areas. Virgin areas currently in the Portal Zone would be transferred to the Interior, thus reserving them from logging. The existing timber sale contracts would be modified in accordance with the findings of environmental analyses, and all portions of the major blocks of virgin forest would be deleted from the sales. Vegetation could be cut in both zones (non-commercially) to clear areas for campsites, trails, portages, for fire management, for public safety, and to aid the suppression of insects and diseases.

Large equipment, such as tractors, would be allowed for bunching slash and preparing sites for reforestation in the Portal Zone where logging or fire has disturbed the vegetation.

Herbicides would not be used to manipulate plant composition.

Motorized ice and snowcraft would not be permitted.

Campsites with latrines and firegrates would be provided in both zones. In the remote areas they would not be provided unless sanitary or protection measures required it. Remote areas would be served by a very primitive trail network.

A visitor capacity and distribution plan which would identify length and location of stay would be implemented under this alternative. Travel permits would be required and the maximum party size limited to 10.

Motorized mechanical portages between lakes along the International Boundary and between car access lakes along motor routes would be continued under commercial special use permits.

Temporary roads could be constructed for authorized uses and emergencies in the Portal Zone. No roads would be constructed in the Interior Zone.

Exploration for, and the extraction of, minerals will be limited or prohibited to the extent permitted by law where determined to be incompatible with wilderness or other environmental values.

## ALTERNATIVE 6

Alternative 6 gives maximum emphasis to the natural qualities of the BWCA and would provide the most primitive recreation experience opportunities. The entire BWCA would be managed as an Interior Zone. Motors on watercraft would not be permitted. Neither land nor water zoning would be necessary because the same activities and uses would be permitted throughout the area.

In protecting the land resources, prevention programs would be aimed at excluding wildfires. If a fire should occur and were detected, it would be suppressed only if a major disaster was likely to occur or if the fire posed a threat to public safety.

Insect and disease infestations would not be suppressed.

No effort would be made to protect existing water levels through structure maintenance or replacement. Efforts would be made to remove dams which affect water levels with a goal of having all water levels revert to pre-1850 conditions.

Permitted activities and uses would be regulated to avoid adverse effects on air, water, soil and scenic qualities.

Commercial logging and forest product removal would not be permitted, but vegetation could be cut (non-commercially) to develop campsites, to construct trails and portages or for fire management purposes. The cessation of all logging activity would give maximum protection to the remaining virgin forests. Existing sale contracts would be cancelled.

Large equipment, such as tractors would not be permitted to clear and prepare the ground for reforestation.

Burning of vegetation would be permitted but with limitations depending on risks, and without the aid of heavy equipment or supplemental cutting.

Herbicides would not be used to manipulate plant composition.

The use of motorized recreational vehicles would not be permitted nor would the motorized mechanical portages be continued.

Campsite construction and maintenance would be allowed with the number and location determined through a capacity and distribution plan. Entry and travel permits would be required, the maximum party size would be 10 and the length of stay at campsites would be regulated.

Construction of temporary roads would be allowed only for emergency purposes.

Exploration for, and the extraction of, minerals would be prohibited to the extent allowed by law.